60 F.3d 1411
 64 USLW 2070, 95 Cal. Daily Op. Serv. 5761,
95 Daily Journal D.A.R. 9798
 VOTING RIGHTS COALITION; Coalition for an African-American
Community Agenda; League of Women Voters of California;
California Common Cause; '94 Committee; Stella Dominquez;
Cynthia Moreno; and Veronica Moreno, Plaintiffs-Appellees,
v.
Pete WILSON, Governor of the State of California; Tony
Miller, Acting Secretary of State, California; Frank Zolin,
Director of the California Department of Motor Vehicles;
Eloise Anderson, Director of the California Department of
Social Services; Brenda Premo, Director of the California
Department of Rehabilitation, Defendants-Appellants,
v.
Janet RENO, Attorney General; United States of America,
Third Party Plaintiffs-Appellees.
 No. 95-15449.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 16, 1995.
Decided July 24, 1995.
 
 Cyrus J. Rickards, Deputy Atty. Gen., Sacramento, CA, for defendants-appellants.
 Samuel R. Bagenstos, Steven H. Rosenbaum, U.S. Dept. of Justice, Washington, DC, Mei Lin Kwan-Gett, Mark D. Rosenbaum, ACLU Foundation of Southern California, Los Angeles, CA, Robert Rubin, Lawyers' Committee for Civil Rights of San Francisco Bay Area, San Francisco, CA, for plaintiffs-appellees.
 Miriam E. Brewster, Deputy Atty., County of San Diego, San Diego, CA, Anton Leof, Latham & Watkins, San Francisco, CA, Michael J. Guzman, Latham & Watkins, Washington, DC, Daniel J. Popeo, Washington Legal Foundation, Washington, DC, Joseph Remcho, Remcho, Johansen & Purcell, San Francisco, CA, Donald W. Brown, Brobeck, Phleger & Harrison, San Francisco, CA, Douglas I. Horngrad, San Francisco, CA, for amici.
 W. Mark Dunn, Asst. Atty. Gen., Com. of Virginia, Richmond, VA, for Com. of Virginia.
 Appeal from the United States District Court for the Northern District of California.
 Before: GOODWIN, SNEED, and KLEINFELD, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 Governor Wilson, in his official capacity, directed the appropriate officials of the State of California not to comply with the National Voter Registration Act of 1993, 42 U.S.C. Secs. 1973gg-1 to -10 ("the Act"), on constitutional grounds. The Voting Rights Coalition, joined by the Attorney General of the United States, having come together as a result of a suit by the State of California against the United States to enjoin permanently the enforcement of the Act, obtained a permanent injunction in the district court enjoining California from failing to comply with the Act. The State of California sought to stay that injunction pending appeal by way of a motion to this court, which was denied. We affirm the judgment of the district court directing the State of California to comply with the Act.
 
 
 2
 The Act in form is not a simple directive to the states to provide voter registration at such places as the state receives applications for motor vehicle driver's licenses, and provides public assistance or services to persons with disabilities. Rather, it is a complex statute of ten sections bearing the marks of legislative draftsmanship similar to those borne by the Internal Revenue Code. For example, 42 U.S.C. Sec. 1973gg-3, entitled "SIMULTANEOUS APPLICATION FOR VOTER REGISTRATION AND APPLICATION FOR MOTOR VEHICLE DRIVER'S LICENSE," contains five subsections, (a) through (e), of which the third, (c), sets forth its own two subsections, (1) and (2), and of which the section (2) sets forth its five subsections, (A) through (E). That is not all. Within (A) through (E), there appear in (C) and (D) three subsections each. Thus, following the caption of section 3 of the Act, the State of California must conform to four levels of statutory structures.
 
 
 3
 This complexity suggests that the implementation of this Act could generate differences between the United States and California of interpretive and, possibly, constitutional importance. For this reason, our opinion is not intended to foreclose future judicial review of any such issues. Today we speak only with respect to an as yet unapplied statute. As a consequence, we assume, but do not decide, that all such interpretive or constitutional issues that might arise in the implementation of the Act do not impair our analysis of the Act's facial constitutionality.
 
 
 4
 Three provisions of the Constitution must be considered in our analysis of the constitutionality of the Act. The most important is Article I, section 4, which vests in Congress the power to alter state laws pertaining to the "Times, Places and Manner" of electing Representatives and Senators. The second is Article I, section 2, which gives the states the power to fix the qualifications of its voters. The third, on which California primarily relies, is the Tenth Amendment.
 
 
 5
 The relevant portion of Article I, section 4 reads as follows:
 
 
 6
 The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.
 
 
 7
 U.S. Const. art. I, Sec. 4, cl. 1. Initially, two aspects of the provision appear. No limits on this power are stated and registration procedures are not mentioned. As Chief Judge Posner of the Seventh Circuit pointed out in Association of Community Orgs. for Reform Now (ACORN) v. Edgar, 56 F.3d 791, 793 (7th Cir.1995), summarized in 63 U.S.L.W. 2776, 2777 (7th Cir. June 20, 1995) (No. 95-1800), registration did not exist as a procedure, separate from establishing one's qualifications to vote at the time and place of voting, when the Constitution was drafted. As a consequence, Article I, section 2 and the Seventeenth Amendment, in vesting the power to fix the qualifications of voters for Representatives and Senators in the states, do not explicitly remove the registration of voters by the states from the reach of the power of Congress, provided by Article I, section 4. The fact that some states include registration in their enumeration of qualifications does not alter this conclusion.[1]
 
 
 8
 Moreover, the Supreme Court has read the grant of power to Congress in Article I, section 4 as quite broad. In Smiley v. Holm, 285 U.S. 355, 366, 52 S.Ct. 397, 399, 76 L.Ed. 795 (1932), the Court stated that Congress has
 
 
 9
 authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.
 
 
 10
 At an earlier date, Ex Parte Siebold, 100 U.S. 371, 382-97, 25 L.Ed. 717 (1879), upheld the power of Congress to impose duties, prohibitions, and sanctions for state election officials involved in conducting elections for federal office. Conflicting state laws were set aside.[2] 100 U.S. at 397.
 
 
 11
 The broad power given to Congress over congressional elections has been extended to presidential elections, Burroughs v. United States, 290 U.S. 534, 545, 54 S.Ct. 287, 290, 78 L.Ed. 484 (1934), and to party primaries involving contestants for congressional positions, United States v. Classic, 313 U.S. 299, 317, 61 S.Ct. 1031, 1038-39, 85 L.Ed. 1368 (1941). Judge Wisdom of the Fifth Circuit, while sitting on a three-judge district court in United States v. Manning, 215 F.Supp. 272, 284 (W.D.La.1963), expansively observed that " 'the manner of holding elections' therefore must be read as referring to the entire electoral process, from the first step of registering to the last step, the [s]tate's promulgation of honest returns." It is not necessary to rely on a reading of Article I, section 4 of such breadth to find that the Act before us, on its face, fits comfortably within its grasp. However, we are reminded that Justice Black in Oregon v. Mitchell, 400 U.S. 112, 123-25, 91 S.Ct. 260, 264-65, 27 L.Ed.2d 272 (1970), in his plurality opinion, recognized that, while Congress could lower the voting age in federal elections from twenty-one to eighteen, Article I, section 2 bars Congress from doing so in elections for state officials.
 
 
 12
 This array of authorities supporting a broad reach of Article I, section 4 does not permit this court to limit its meaning to that given it by Hamilton in Federalist No. 59.[3] He saw it as a means by which Congress could preserve itself from states seeking its destruction by refusing to conduct elections. Story enhanced its utility somewhat in his Commentaries.[4]
 
 
 13
 The Tenth Amendment position argued by the State of California rests on New York v. United States, 505 U.S. 144, 169-78, 112 S.Ct. 2408, 2425-29, 120 L.Ed.2d 120 (1992), which held, in its relevant part, that Congress could not impose on the states the burden of exercising its power under the Constitution to regulate interstate commerce. Of course, Congress could obtain the consent of a state, or states, to undertake such a burden upon payment of a mutually acceptable consideration. The flaw in the State of California's argument is that it ignores Article I, section 4, which, unlike the commerce power in Article I, section 8, empowers Congress to impose on the states precisely the burden at issue.
 
 
 14
 Congress may conscript state agencies to carry out voter registration for the election of Representatives and Senators. The exercise of that power by Congress is by its terms intended to be borne by the states without compensation. None of the authorities recognizing the exercise of the Times, Places and Manner power vested in Congress have suggested, even remotely, the necessity of the United States bearing the burden of any alteration it imposed. True, usually the actual cost to the states was relatively small, while in this instance, it may be significant. That does not change the principle which is embodied in Article I, section 4, but it does dictate that the implementation of the Act be done sensitively. To separate the power to command change from the burden of meeting its costs is always troublesome whatever its context. Nor is legitimate concern diminished by the fact that enactment of the Act was driven substantially by partisan politics.
 
 
 15
 It is not the role of this court to undertake at this time the difficult task of implementing the Act. Even a cursory glance at the Act suggests this will not be a simple undertaking. Even though the Act by its terms does not control the practices of voter registration for elections of state and local officials, its impact on such elections probably will be significant.
 
 
 16
 It is at this juncture that the sovereignty of the State of California under the Tenth Amendment becomes a constitutional concern. In U.S. Term Limits, Inc. v. Thornton, --- U.S. ----, ----, 115 S.Ct. 1842, 1872, 131 L.Ed.2d 881 (1995), Justice Kennedy, in his concurring opinion, explaining his decisive fifth vote in the decision to invalidate the effort of certain states to limit the terms their Representatives and Senators could serve in Congress, eloquently described the fundamental structure of the Constitution:
 
 
 17
 Federalism was our Nation's own discovery. The Framers split the atom of sovereignty. It was the genius of their idea that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other. The resulting Constitution created a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it. It is appropriate to recall these origins, which instruct us as to the nature of the two different governments created and confirmed by the Constitution.
 
 
 18
 The State of California is a sovereign body within the Constitution. There can be no doubt of that, no less than of the power of Congress under Article I, section 4 of the Constitution. Absent the invocation by Congress of its authority under the Fourteenth Amendment, the State of California possesses the power to fix the time, place, and manner of the election of its officials. It follows, therefore, that an accommodation, as Justice Kennedy made clear, of sovereign rights is necessary.
 
 
 19
 Presently, we explicitly recognize that, inasmuch as Congress only sought to regulate the times, places, and manner of electing Representatives and Senators, it did not intend to perform the same function for state and local officials. No doubt it was recognized by Congress that the Act would have an impact on registration procedures applicable to state and local elections and even perhaps hoped that it would do so. Nonetheless, it did not attempt to do so explicitly.
 
 
 20
 The State of California, in supplemental briefing, has confirmed that the Act will have a significant impact on its registration procedures applicable to elections of state and local officials. However, at this point we cannot determine the extent to which, if at all, these changes impinge on the legitimate retained sovereignty of the states under the "two orders of government" (as Justice Kennedy put it) of the Constitution. Clearly, the Constitution denies to the states any power to obstruct the exercise by Congress of its power to "make or alter" the "Times, Places and Manner" of electing "Senators and Representatives," nor does it impose on the United States the burden, always heretofore borne by the states, of defraying the costs incurred by such alterations.
 
 
 21
 At this juncture of these proceedings, we can only direct the district court on remand to impose no burdens on the state not authorized by the Act which would impair the State of California's retained power to conduct its state elections as it sees fit. We foresee the possibility in which the district court will be asked to determine whether a certain implementation of the statute sought by the United States, which is helpful but not essential to its interests, is properly resisted by the state on substantial grounds related to its sovereignty. Should such occasions arise, we would expect the district court to respond with an informed understanding of the duality of sovereignty imbedded within the Constitution of the United States.
 
 
 22
 This adjuration springs from the same perception that led the unanimous Court of Appeals for the Seventh Circuit to strike from the district court's decree its fourth paragraph which Chief Judge Posner, in his opinion for the court, described as failing "to exhibit an adequate sensitivity to the principle of federalism." ACORN, 56 F.3d at 798.
 
 
 23
 We, too, by this opinion, direct the district court to approach its task of implementation with an "adequate sensitivity to the principle of federalism." This panel hereby retains jurisdiction in the event of subsequent proceedings and appeals.
 
 
 24
 No party to recover costs on appeal.
 
 
 25
 AFFIRMED AND REMANDED FOR IMPLEMENTATION.
 
 
 
 [1]
 With respect to this circuit, Alaska, Hawaii, Montana and Oregon treat registration as a qualification of voting. See Alaska Const. art. V, Sec. 1; Alaska Stat. Sec. 15.05.010 (1988); Haw. Const. art. II, Sec. 1; Haw.Rev.Stat. Sec. 11-11 (1985); Mont. Const. art. IV, Sec. 2; Mont.Code Ann. Sec. 13-1-111 (1994); Or. Const. art. II, Sec. 2; Or.Rev.Stat. Secs. 247.002, 247.009 (1993)
 
 
 [2]
 The Court continued to interpret broadly Congress's power under Article I, section 4. See Roudebush v. Hartke, 405 U.S. 15, 24-25, 92 S.Ct. 804, 810-11, 31 L.Ed.2d 1 (1972) (authority to regulate recount of elections); United States v. Gradwell, 243 U.S. 476, 483, 37 S.Ct. 407, 410, 61 L.Ed. 857 (1917) (full authority over federal election process, from registration to certification of results); United States v. Mosley, 238 U.S. 383, 386, 35 S.Ct. 904, 905, 59 L.Ed. 1355 (1915) (authority to enforce the right to cast ballot and have ballot counted); In re Coy, 127 U.S. 731, 752, 8 S.Ct. 1263, 1269, 32 L.Ed. 274 (1888) (authority to regulate conduct at any election coinciding with federal contest); Ex parte Yarbrough, 110 U.S. 651, 662, 4 S.Ct. 152, 157-58, 28 L.Ed. 274 (1884) (authority to make additional laws for free, pure, and safe exercise of right to vote); Ex parte Clarke, 100 U.S. 399, 404, 25 L.Ed. 715 (1879) (authority to punish state election officers for violation of state duties vis-a-vis Congressional elections); see also United States v. Simms, 508 F.Supp. 1179, 1183-85 (W.D.La.1979) (criminalizing payments in reference to registration or voting does not offend Tenth Amendment); Prigmore v. Renfro, 356 F.Supp. 427, 430 (N.D.Ala.1972) (absentee ballot program upheld as applied to federal elections), aff'd, 410 U.S. 919, 93 S.Ct. 1369, 35 L.Ed.2d 582 (1973); Fowler v. Adams, 315 F.Supp. 592, 594 (M.D.Fla.1970), appeal dismissed, 400 U.S. 986, 91 S.Ct. 477, 27 L.Ed.2d 436 (1971) (authority to exact 5 percent filing fee for Congressional elections)
 
 
 [3]
 The Federalist No. 59, at 399 (Alexander Hamilton) (Jacob E. Cooke ed., 1961):
 Nothing can be more evident, than that an exclusive power of regulating elections for the National Government, in the hands of the State Legislatures, would leave the existence of the Union entirely at their mercy. They could at any moment annihilate it, by neglecting to provide for the choice of persons to administer its affairs. It is to little purpose to say that a neglect or omission of this kind, would not be likely to take place. The constitutional possibility of the thing, without an equivalent for the risk, is an unanswerable objection. Nor has any satisfactory reason been yet assigned for incurring that risk.
 
 
 [4]
 Joseph Story, Commentaries on the Constitution of the United States 292-93 (Rotunda and Nowak ed. 1987). Story gave several justifications for Article 1, section 4: as a means to correct negligent state law, to impose a check on senatorial plots to prevent state citizens from holding elections, to ensure safe elections in times of invasion, and to prevent vacancies by maintaining uniformity in the times and manner of elections