Justice SCALIA delivered the opinion of the Court.
*4 The National Voter Registration Act requires States to "accept and use" a uniform federal form to register voters for federal elections. The contents of that form (colloquially known as the Federal Form) are prescribed by a federal agency, the Election Assistance Commission. The Federal Form developed by the EAC does not require documentary evidence of citizenship; rather, it requires only that an applicant *5 aver, under penalty of perjury, that he is a citizen. Arizona law requires voter-registration officials to "reject" any application for registration, including a Federal Form, that is not accompanied by concrete evidence of citizenship. The question is whether Arizona's evidence-of-citizenship requirement, as applied to Federal Form applicants, is pre-empted by the Act's mandate that States " accept and use" the Federal Form.
I
Over the past two decades, Congress has erected a complex superstructure of federal regulation atop state voter-registration systems. The National Voter Registration Act of 1993 (NVRA), 107 Stat. 77, as amended, 42 U.S.C. § 1973gg et seq., "requires States to provide simplified systems for registering to vote in federal elections." Young v. Fordice, 520 U.S. 273, 275, 117 S.Ct. 1228, 137 L.Ed.2d 448 (1997). The Act requires each State to permit prospective voters to "register to vote in elections for Federal office" by any of three methods: simultaneously with a driver's license application, in person, or by mail. § 1973gg-2(a).
This case concerns registration by mail. Section 1973gg-2(a)(2) of the Act requires a State to establish procedures for registering to vote in federal elections "by mail application pursuant to section 1973gg-4 of this title." Section 1973gg-4, in turn, requires States to "accept and use" a standard federal registration form. § 1973gg-4(a)(1). The Election Assistance Commission is invested with rulemaking authority to prescribe the contents of that Federal Form. § 1973gg-7(a)(1) ; see § 15329.[1]
*2252 The EAC is explicitly instructed, however, to develop the Federal Form "in consultation with the chief election officers of the States." § 1973gg-7(a)(2). The Federal Form thus contains a number *6 of state-specific instructions, which tell residents of each State what additional information they must provide and where they must submit the form. See National Mail Voter Registration Form, pp. 3-20, online at http://www.eac.gov (all Internet materials as visited June 11, 2013, and available in Clerk of Court's case file); 11 CFR § 9428.3 (2012). Each state-specific instruction must be approved by the EAC before it is included on the Federal Form.
To be eligible to vote under Arizona law, a person must be a citizen of the United States. Ariz. Const., Art. VII, § 2 ; Ariz.Rev.Stat. Ann. § 16-101(A) (West 2006). This case concerns Arizona's efforts to enforce that qualification. In 2004, Arizona voters adopted Proposition 200, a ballot initiative designed in part "to combat voter fraud by requiring voters to present proof of citizenship when they register to vote and to present identification when they vote on election day." Purcell v. Gonzalez, 549 U.S. 1, 2, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam ).[2] Proposition 200 amended the State's election code to require county recorders to "reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship." Ariz.Rev.Stat. Ann. § 16-166(F) (West Supp.2012). The proof-of-citizenship requirement is satisfied by (1) a photocopy of the applicant's passport or birth certificate, (2) a driver's license number, if the license states that the issuing authority verified the holder's U.S. citizenship, (3) evidence of naturalization, (4) tribal identification, or (5) "[o]ther documents or methods of proof ... established pursuant to the Immigration Reform and Control Act of 1986." Ibid. The EAC did not grant Arizona's request to include this new requirement among the state-specific instructions for Arizona on the Federal Form. App. 225. Consequently, the Federal Form includes a statutorily required attestation, subscribed to under penalty of *7 perjury, that an Arizona applicant meets the State's voting requirements (including the citizenship requirement), see § 1973gg-7(b)(2), but does not require concrete evidence of citizenship.
The two groups of plaintiffs represented here-a group of individual Arizona residents (dubbed the Gonzalez plaintiffs, after lead plaintiff Jesus Gonzalez) and a group of nonprofit organizations led by the Inter Tribal Council of Arizona (ITCA)-filed separate suits seeking to enjoin the voting provisions of Proposition 200. The District Court consolidated the cases and denied the plaintiffs' motions for a preliminary injunction. App. to Pet. for Cert. 1g. A two-judge motions panel of the Court of Appeals for the Ninth Circuit then enjoined Proposition 200 pending appeal. Purcell, 549 U.S., at 3, 127 S.Ct. 5. We vacated that order and allowed the impending 2006 election to proceed with the new rules in place. Id., at 5-6, 127 S.Ct. 5. On remand, the Court of Appeals affirmed the District Court's initial denial of a preliminary injunction as to respondents' claim that the NVRA pre-empts Proposition 200's registration rules. Gonzalez v. Arizona, 485 F.3d 1041, 1050-1051 (2007). The District Court then granted Arizona's motion for summary judgment as to that *2253 claim. App. to Pet. for Cert. 1e, 3e. A panel of the Ninth Circuit affirmed in part but reversed as relevant here, holding that "Proposition 200's documentary proof of citizenship requirement conflicts with the NVRA's text, structure, and purpose." Gonzalez v. Arizona, 624 F.3d 1162, 1181 (2010). The en banc Court of Appeals agreed. Gonzalez v. Arizona, 677 F.3d 383, 403 (2012). We granted certiorari. 568 U.S. ----, 133 S.Ct. 476, 184 L.Ed.2d 296 (2012).
II
The Elections Clause, Art. I, § 4, cl. 1, provides:
"The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress *8 may at any time by Law make or alter such Regulations, except as to the places of chusing Senators."
The Clause empowers Congress to pre-empt state regulations governing the "Times, Places and Manner" of holding congressional elections. The question here is whether the federal statutory requirement that States "accept and use" the Federal Form pre-empts Arizona's state-law requirement that officials "reject" the application of a prospective voter who submits a completed Federal Form unaccompanied by documentary evidence of citizenship.
A
The Elections Clause has two functions. Upon the States it imposes the duty ("shall be prescribed") to prescribe the time, place, and manner of electing Representatives and Senators; upon Congress it confers the power to alter those regulations or supplant them altogether. See U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 804-805, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) ; id., at 862, 115 S.Ct. 1842 (THOMAS, J., dissenting). This grant of congressional power was the Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress. "[E]very government ought to contain in itself the means of its own preservation," and "an exclusive power of regulating elections for the national government, in the hands of the State legislatures, would leave the existence of the Union entirely at their mercy. They could at any moment annihilate it by neglecting to provide for the choice of persons to administer its affairs." The Federalist No. 59, pp. 362-363 (C. Rossiter ed. 1961) (A. Hamilton) (emphasis deleted). That prospect seems fanciful today, but the widespread, vociferous opposition to the proposed Constitution made it a very real concern in the founding era.
The Clause's substantive scope is broad. "Times, Places, and Manner," we have written, are "comprehensive words," which "embrace authority to provide a complete code for congressional *9 elections," including, as relevant here and as petitioners do not contest, regulations relating to "registration." Smiley v. Holm, 285 U.S. 355, 366, 52 S.Ct. 397, 76 L.Ed. 795 (1932) ; see also Roudebush v. Hartke, 405 U.S. 15, 24-25, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972) (recounts); United States v. Classic, 313 U.S. 299, 320, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) (primaries). In practice, the Clause functions as "a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices." Foster v. Love, 522 U.S. 67, 69, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997) (citation omitted). The power of Congress over the "Times, Places and Manner" of congressional elections "is paramount, and may be exercised at any time, *2254 and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith." Ex parte Siebold, 100 U.S. 371, 392, 25 L.Ed. 717 (1880).
B
The straightforward textual question here is whether Ariz.Rev.Stat. Ann. § 16-166(F), which requires state officials to "reject" a Federal Form unaccompanied by documentary evidence of citizenship, conflicts with the NVRA's mandate that Arizona "accept and use" the Federal Form. If so, the state law, "so far as the conflict extends, ceases to be operative." Siebold, supra, at 384. In Arizona's view, these seemingly incompatible obligations can be read to operate harmoniously: The NVRA, it contends, requires merely that a State receive the Federal Form willingly and use that form as one element in its (perhaps lengthy) transaction with a prospective voter.
Taken in isolation, the mandate that a State "accept and use" the Federal Form is fairly susceptible of two interpretations. It might mean that a State must accept the Federal Form as a complete and sufficient registration application; or it might mean that the State is merely required to receive the form willingly and use it somehow in its voter *10 registration process. Both readings-"receive willingly" and "accept as sufficient"-are compatible with the plain meaning of the word "accept." See 1 Oxford English Dictionary 70 (2d ed. 1989) ("To take or receive (a thing offered) willingly"; "To receive as sufficient or adequate"); Webster's New International Dictionary 14 (2d ed. 1954) ("To receive (a thing offered to or thrust upon one) with a consenting mind"; "To receive with favor; to approve"). And we take it as self-evident that the "elastic" verb "use," read in isolation, is broad enough to encompass Arizona's preferred construction. Smith v. United States, 508 U.S. 223, 241, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (SCALIA, J., dissenting). In common parlance, one might say that a restaurant accepts and uses credit cards even though it requires customers to show matching identification when making a purchase. See also Brief for State Petitioners 40 ("An airline may advertise that it 'accepts and uses' e-tickets ..., yet may still require photo identification before one could board the airplane").
"Words that can have more than one meaning are given content, however, by their surroundings." Whitman v. American Trucking Assns., Inc., 531 U.S. 457, 466, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) ; see also Smith, supra, at 241, 113 S.Ct. 2050 (SCALIA, J., dissenting). And reading "accept" merely to denote willing receipt seems out of place in the context of an official mandate to accept and use something for a given purpose. The implication of such a mandate is that its object is to be accepted as sufficient for the requirement it is meant to satisfy. For example, a government diktat that "civil servants shall accept government IOUs for payment of salaries" does not invite the response, "sure, we'll accept IOUs-if you pay us a ten percent down payment in cash." Many federal statutes contain similarly phrased commands, and they contemplate more than mere willing receipt. See, e.g., 5 U.S.C. § 8332(b), (m)(3) ("The Office [of Personnel Management] shall accept the certification of" various officials concerning creditable service toward civilian-employee retirement); 12 U.S.C.A. § 2605(l) (2) (Supp.2013)
*11 ("A servicer of a federally related mortgage shall accept any reasonable form of written confirmation from a borrower of existing insurance coverage"); 16 U.S.C. § 1536(p) (Endangered *2255 Species Committee "shall accept the determinations of the President" with respect to whether a major disaster warrants an exception to the Endangered Species Act's requirements); § 4026(b)(2), 118 Stat. 3725, note following 22 U.S.C. § 2751, p. 925 (FAA Administrator "shall accept the certification of the Department of Homeland Security that a missile defense system is effective and functional to defend commercial aircraft against" man-portable surface-to-air missiles); 25 U.S.C. § 1300h-6(a) ("For the purpose of proceeding with the per capita distribution" of certain funds, "the Secretary of the Interior shall accept the tribe's certification of enrolled membership"); 30 U.S.C. § 923(b) (the Secretary of Labor "shall accept a board certified or board eligible radiologist's interpretation" of a chest X ray used to diagnose black lung disease ); 42 U.S.C. § 1395w-21(e)(6)(A) ("[A] Medicare+Choice organization ... shall accept elections or changes to elections during" specified periods).[3]
Arizona's reading is also difficult to reconcile with neighboring provisions of the NVRA. Section 1973gg-6(a)(1)(B) provides that a State shall "ensure that any eligible applicant is registered to vote in an election ... if the valid voter registration form of the applicant is postmarked" not later than a specified number of days before the election. (Emphasis added.) Yet Arizona reads the phrase "accept and use" in § 1973gg-4(a)(1) as permitting it to reject a completed *12 Federal Form if the applicant does not submit additional information required by state law. That reading can be squared with Arizona's obligation under § 1973gg-6(a)(1) only if a completed Federal Form is not a "valid voter registration form," which seems unlikely. The statute empowers the EAC to create the Federal Form, § 1973gg-7(a), requires the EAC to prescribe its contents within specified limits, § 1973gg-7(b), and requires States to "accept and use" it, § 1973gg-4(a)(1). It is improbable that the statute envisions a completed copy of the form it takes such pains to create as being anything less than "valid."
The Act also authorizes States, "[i]n addition to accepting and using the" Federal Form, to create their own, state-specific voter-registration forms, which can be used to register voters in both state and federal elections. § 1973gg-4(a)(2) (emphasis added). These state-developed forms may require information the Federal Form does not. (For example, unlike the Federal Form, Arizona's registration form includes Proposition 200's proof-of-citizenship requirement. See Arizona Voter Registration Form, p. 1, online at http://www.azsos.gov.) This permission works in tandem with the requirement that States "accept and use" the Federal Form. States retain the flexibility to design and use their own registration forms, but the Federal Form provides a backstop: No matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be available.[4]
*13 *2256 Arizona's reading would permit a State to demand of Federal Form applicants every additional piece of information the State requires on its state-specific form. If that is so, the Federal Form ceases to perform any meaningful function, and would be a feeble means of "increas[ing] the number of eligible citizens who register to vote in elections for Federal office." § 1973gg(b).
Finally, Arizona appeals to the presumption against pre-emption sometimes invoked in our Supremacy Clause cases. See, e.g., Gregory v. Ashcroft, 501 U.S. 452, 460-461, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). Where it applies, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). That rule of construction rests on an assumption about congressional intent: that "Congress does not exercise lightly" the "extraordinary power" to "legislate in areas traditionally regulated by the States." Gregory, supra, at 460, 111 S.Ct. 2395. We have never mentioned such a principle in our Elections Clause cases.[5] Siebold, for example, *14 simply said that Elections Clause legislation, "so far as it extends and conflicts with the regulations of the State, necessarily supersedes them." 100 U.S., at 384. There is good reason for treating Elections Clause legislation differently: The assumption that Congress is reluctant to pre-empt does not hold when Congress acts under that constitutional provision, which empowers Congress to "make or alter" state election *2257 regulations. Art. I, § 4, cl. 1. When Congress legislates with respect to the "Times, Places and Manner" of holding congressional elections, it necessarily displaces some element of a pre-existing legal regime erected by the States.[6] Because the power the Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent. Moreover, the federalism concerns underlying the presumption in the Supremacy Clause context are somewhat weaker here. Unlike the States' "historic police powers," Rice, supra, at 230, 67 S.Ct. 1146, the States' *15 role in regulating congressional elections-while weighty and worthy of respect-has always existed subject to the express qualification that it "terminates according to federal law." Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 347, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001). In sum, there is no compelling reason not to read Elections Clause legislation simply to mean what it says.
We conclude that the fairest reading of the statute is that a state-imposed requirement of evidence of citizenship not required by the Federal Form is "inconsistent with" the NVRA's mandate that States "accept and use" the Federal Form. Siebold, supra, at 397. If this reading prevails, the Elections Clause requires that Arizona's rule give way.
We note, however, that while the NVRA forbids States to demand that an applicant submit additional information beyond that required by the Federal Form, it does not preclude States from "deny[ing] registration based on information in their possession establishing the applicant's ineligibility."[7] Brief for United States as Amicus Curiae 24. The NVRA clearly contemplates that not every submitted Federal Form will result in registration. See § 1973gg-7(b)(1) (Federal Form "may require only" information "necessary to enable the appropriate State election official to assess the eligibility of the applicant " (emphasis added)); § 1973gg-6(a)(2) (States must require election officials to "send notice to each applicant of the disposition of the application").
III
Arizona contends, however, that its construction of the phrase "accept and use" is necessary to avoid a conflict between *16 the NVRA and Arizona's constitutional authority to establish qualifications (such as citizenship) for voting. Arizona is correct that the Elections Clause empowers Congress to regulate how federal elections are held, but not who may vote in them. The *2258 Constitution prescribes a straightforward rule for the composition of the federal electorate. Article I, § 2, cl. 1, provides that electors in each State for the House of Representatives "shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature," and the Seventeenth Amendment adopts the same criterion for senatorial elections. Cf. also Art. II, § 1, cl. 2 ("Each State shall appoint, in such Manner as the Legislature thereof may direct," presidential electors). One cannot read the Elections Clause as treating implicitly what these other constitutional provisions regulate explicitly. "It is difficult to see how words could be clearer in stating what Congress can control and what it cannot control. Surely nothing in these provisions lends itself to the view that voting qualifications in federal elections are to be set by Congress." Oregon v. Mitchell, 400 U.S. 112, 210, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (Harlan, J., concurring in part and dissenting in part); see also U.S. Term Limits, 514 U.S., at 833-834, 115 S.Ct. 1842; Tashjian v. Republican Party of Conn., 479 U.S. 208, 231-232, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (Stevens, J., dissenting).[8] *17 Prescribing voting qualifications, therefore, "forms no part of the power to be conferred upon the national government" by the Elections Clause, which is "expressly restricted to the regulation of the times, the places, and the manner of elections." The Federalist No. 60, at 371 (A. Hamilton); see also id., No. 52, at 326 (J. Madison). This allocation of authority sprang from the Framers' aversion to concentrated power. A Congress empowered to regulate the qualifications of its own electorate, Madison warned, could "by degrees subvert the Constitution." 2 Records of the Federal Convention of 1787, p. 250 (M. Farrand rev. 1966). At the same time, by tying the federal franchise to the state franchise instead of simply placing it within the unfettered discretion of state legislatures, the Framers avoided "render[ing] too dependent on the State governments that branch of the federal government which ought to be dependent on the people alone." The Federalist No. 52, at 326 (J. Madison).
Since the power to establish voting requirements is of little value without the power to enforce those requirements, Arizona is correct that it would raise serious constitutional doubts if a federal statute *2259 precluded a State from obtaining the information necessary to enforce its voter qualifications.[9] *18 If, but for Arizona's interpretation of the "accept and use" provision, the State would be precluded from obtaining information necessary for enforcement, we would have to determine whether Arizona's interpretation, though plainly not the best reading, is at least a possible one. Cf. Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932) (the Court will "ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided" (emphasis added)). Happily, we are spared that necessity, since the statute provides another means by which Arizona may obtain information needed for enforcement.
Section 1973gg-7(b)(1) of the Act provides that the Federal Form "may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." At oral argument, the United States expressed the view that the phrase "may require only" in § 1973gg-7(b)(1) means that the EAC "shall require information that's necessary, but may only require that information." Tr. of Oral Arg. 52 (emphasis added); see also Brief for ITCA Respondents 46; Tr. of Oral Arg. 37-39 (ITCA Respondents' counsel). That is to say, § 1973gg-7(b)(1) acts as both a ceiling and a floor with respect to the contents of the Federal Form. We need not consider the Government's contention that despite the statute's statement that the EAC "may" require on the Federal Form information "necessary to enable the appropriate State election official to assess the eligibility of the applicant," other provisions of the Act indicate that such action is statutorily required. That is because we think that-by analogy to the rule of statutory interpretation *19 that avoids questionable constitutionality-validly conferred discretionary executive authority is properly exercised (as the Government has proposed) to avoid serious constitutional doubt. That is to say, it is surely permissible if not requisite for the Government to say that necessary information which may be required will be required.
Since, pursuant to the Government's concession, a State may request that the EAC alter the Federal Form to include information the State deems necessary to determine eligibility, see § 1973gg-7(a)(2) ; Tr. of Oral Arg. 55 (United States), and may challenge the EAC's rejection of that request in a suit under the Administrative Procedure Act, see 5 U.S.C. §§ 701 - 706, no constitutional doubt is raised by giving the "accept and use" provision of the NVRA its fairest reading. That alternative means of enforcing its constitutional power to determine voting qualifications remains open to Arizona here. In 2005, the EAC divided 2-to-2 on the request by Arizona to include the evidence-of-citizenship requirement among the state-specific instructions on the Federal Form, App.
*2260 225, which meant that no action could be taken, see 42 U.S.C. § 15328 ("Any action which the Commission is authorized to carry out under this chapter may be carried out only with the approval of at least three of its members"). Arizona did not challenge that agency action (or rather inaction) by seeking APA review in federal court, see Tr. of Oral Arg. 11-12 (Arizona), but we are aware of nothing that prevents Arizona from renewing its request.[10] Should the *20 EAC's inaction persist, Arizona would have the opportunity to establish in a reviewing court that a mere oath will not suffice to effectuate its citizenship requirement and that the EAC is therefore under a nondiscretionary duty to include Arizona's concrete evidence requirement on the Federal Form. See 5 U.S.C. § 706(1). Arizona might also assert (as it has argued here) that it would be arbitrary for the EAC to refuse to include Arizona's instruction when it has accepted a similar instruction requested by Louisiana.[11]
We hold that 42 U.S.C. § 1973gg-4 precludes Arizona from requiring a Federal Form applicant to submit information beyond that required by the form itself. Arizona may, however, request anew that the EAC include such a requirement among the Federal Form's state-specific instructions, and may seek judicial review of the EAC's decision under the Administrative Procedure Act.
The judgment of the Court of Appeals is affirmed.
It is so ordered.
Justice KENNEDY, concurring in part and concurring in the judgment.
The opinion for the Court insists on stating a proposition that, in my respectful view, is unnecessary for the proper disposition of the case and is incorrect in any event. The Court concludes that the normal "starting presumption that *21 Congress does not intend to supplant state law," New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), does not apply here because the source of congressional power is the Elections Clause and not some other provision of the Constitution. See ante, at 2256 - 2257.
There is no sound basis for the Court to rule, for the first time, that there exists a hierarchy of federal powers so that some statutes pre-empting state law must be interpreted by different rules than others, all depending upon which power Congress has exercised. If the Court is skeptical of the basic idea of a presumption against pre-emption as a helpful instrument of construction in express pre-emption cases, *2261 see Cipollone v. Liggett Group, Inc., 505 U.S. 504, 545, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (SCALIA, J., concurring in judgment in part and dissenting in part), it should say so and apply that skepticism across the board.
There are numerous instances in which Congress, in the undoubted exercise of its enumerated powers, has stated its express purpose and intent to pre-empt state law. But the Court has nonetheless recognized that "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.' " Altria Group, Inc. v. Good, 555 U.S. 70, 77, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008) (quoting Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) ). This principle is best understood, perhaps, not as a presumption but as a cautionary principle to ensure that pre-emption does not go beyond the strict requirements of the statutory command. The principle has two dimensions: Courts must be careful not to give an unduly broad interpretation to ambiguous or imprecise language Congress uses. And they must confine their opinions to avoid overextending a federal statute's pre-emptive reach. Error on either front may put at risk the validity and effectiveness of laws that Congress did not intend to disturb and that a State has deemed important to its scheme of governance. That *22 concern is the same regardless of the power Congress invokes, whether it is, say, the commerce power, the war power, the bankruptcy power, or the power to regulate federal elections under Article I, § 4.
Whether the federal statute concerns congressional regulation of elections or any other subject proper for Congress to address, a court must not lightly infer a congressional directive to negate the States' otherwise proper exercise of their sovereign power. This case illustrates the point. The separate States have a continuing, essential interest in the integrity and accuracy of the process used to select both state and federal officials. The States pay the costs of holding these elections, which for practical reasons often overlap so that the two sets of officials are selected at the same time, on the same ballots, by the same voters. It seems most doubtful to me to suggest that States have some lesser concern when what is involved is their own historic role in the conduct of elections. As already noted, it may be that a presumption against pre-emption is not the best formulation of this principle, but in all events the State's undoubted interest in the regulation and conduct of elections must be taken into account and ought not to be deemed by this Court to be a subject of secondary importance.
Here, in my view, the Court is correct to conclude that the National Voter Registration Act of 1993 is unambiguous in its pre-emption of Arizona's statute. For this reason, I concur in the judgment and join all of the Court's opinion except its discussion of the presumption against pre-emption. See ante, at 2256 - 2257.

The Help America Vote Act of 2002 transferred this function from the Federal Election Commission to the EAC. See § 802, 116 Stat. 1726, codified at 42 U.S.C. §§ 15532, 1973gg-7(a).

In May 2005, the United States Attorney General precleared under § 5 of the Voting Rights Act of 1965 the procedures Arizona adopted to implement Proposition 200. Purcell, 549 U.S., at 3, 127 S.Ct. 5.

The dissent accepts that a State may not impose additional requirements that render the Federal Form entirely superfluous; it would require that the State "us[e] the form as a meaningful part of the registration process." Post, at 2274 (opinion of ALITO, J.). The dissent does not tell us precisely how large a role for the Federal Form suffices to make it "meaningful": One step out of two? Three? Ten? There is no easy answer, for the dissent's "meaningful part" standard is as indeterminate as it is atextual.

In the face of this straightforward explanation, the dissent maintains that it would be "nonsensical" for a less demanding federal form to exist alongside a more demanding state form. Post, at 2274 - 2275 (opinion of ALITO, J.). But it is the dissent's alternative explanation for § 1973gg-4(a)(2) that makes no sense. The "purpose" of the Federal Form, it claims, is "to facilitate interstate voter registration drives. Thanks to the federal form, volunteers distributing voter registration materials at a shopping mall in Yuma can give a copy of the same form to every person they meet without attempting to distinguish between residents of Arizona and California." Post, at 2275. But in the dissent's world, a volunteer in Yuma would have to give every prospective voter not only a Federal Form, but also a separate set of either Arizona- or California-specific instructions detailing the additional information the applicant must submit to the State. In ours, every eligible voter can be assured that if he does what the Federal Form says, he will be registered. The dissent therefore provides yet another compelling reason to interpret the statute our way.

United States v. Gradwell, 243 U.S. 476, 37 S.Ct. 407, 61 L.Ed. 857 (1917), on which the dissent relies, see post, at 2271 - 2272 (opinion of ALITO, J.), is not to the contrary-indeed, it was not even a pre-emption case. In Gradwell, we held that a statute making it a federal crime "to defraud the United States" did not reach election fraud. 243 U.S., at 480, 483, 37 S.Ct. 407. The Court noted that the provision at issue was adopted in a tax-enforcement bill, and that Congress had enacted but then repealed other criminal statutes specifically covering election fraud. Id., at 481-483, 37 S.Ct. 407.
The dissent cherry-picks some language from a sentence in Gradwell, see post, at 2271 - 2272, but the full sentence reveals its irrelevance to our case:
"With it thus clearly established that the policy of Congress for so great a part of our constitutional life has been, and now is, to leave the conduct of the election of its members to state laws, administered by state officers, and that whenever it has assumed to regulate such elections it has done so by positive and clear statutes, such as were enacted in 1870, it would be a strained and unreasonable construction to apply to such elections this § 37, originally a law for the protection of the revenue and for now fifty years confined in its application to 'Offenses against the Operations of the Government' as distinguished from the processes by which men are selected to conduct such operations." 243 U.S., at 485, 37 S.Ct. 407.
Gradwell says nothing at all about pre-emption, or about how to construe statutes (like the NVRA) in which Congress has indisputably undertaken "to regulate such elections." Ibid.

The dissent counters that this is so "whenever Congress legislates in an area of concurrent state and federal power." Post, at 2272 (opinion of ALITO, J.). True, but irrelevant: Elections Clause legislation is unique precisely because it always falls within an area of concurrent state and federal power. Put differently, all action under the Elections Clause displaces some element of a pre-existing state regulatory regime, because the text of the Clause confers the power to do exactly (and only) that. By contrast, even laws enacted under the Commerce Clause (arguably the other enumerated power whose exercise is most likely to trench on state regulatory authority) will not always implicate concurrent state power-a prohibition on the interstate transport of a commodity, for example.

The dissent seems to think this position of ours incompatible with our reading of § 1973gg-6(a)(1)(B), which requires a State to "ensure that any eligible applicant is registered to vote in an election ... if the valid voter registration form of the applicant is postmarked" by a certain date. See post, at 2274 - 2275 (opinion of ALITO, J.). What the dissent overlooks is that § 1973gg-6(a)(1)(B) only requires a State to register an "eligible applicant" who submits a timely Federal Form. (Emphasis added.)

In Mitchell, the judgment of the Court was that Congress could compel the States to permit 18-year-olds to vote in federal elections. Of the five Justices who concurred in that outcome, only Justice Black was of the view that congressional power to prescribe this age qualification derived from the Elections Clause, 400 U.S., at 119-125, 91 S.Ct. 260, while four Justices relied on the Fourteenth Amendment, id., at 144, 91 S.Ct. 260 (opinion of Douglas, J.), 231 (joint opinion of Brennan, White, and Marshall, JJ.). That result, which lacked a majority rationale, is of minimal precedential value here. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 66, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ; Nichols v. United States, 511 U.S. 738, 746, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994) ; H. Black, Handbook on the Law of Judicial Precedents 135-136 (1912). Five Justices took the position that the Elections Clause did not confer upon Congress the power to regulate voter qualifications in federal elections. Mitchell, supra, at 143, 91 S.Ct. 260 (opinion of Douglas, J.), 210 (opinion of Harlan, J.), 288 (opinion of Stewart, J., joined by Burger, C.J., and Blackmun, J.). (Justices Brennan, White, and Marshall did not address the Elections Clause.) This last view, which commanded a majority in Mitchell, underlies our analysis here. See also U.S. Term Limits, 514 U.S., at 833, 115 S.Ct. 1842. Five Justices also agreed that the Fourteenth Amendment did not empower Congress to impose the 18-year-old-voting mandate. See Mitchell, supra, at 124-130, 91 S.Ct. 260 (opinion of Black, J.), 155 (opinion of Harlan, J.), 293-294 (opinion of Stewart, J.).

In their reply brief, petitioners suggest for the first time that "registration is itself a qualification to vote." Reply Brief for State Petitioners 24 (emphasis deleted); see also post, at 2261 - 2262, 2269 - 2270 (opinion of THOMAS, J.); cf. Voting Rights Coalition v. Wilson, 60 F.3d 1411, 1413, and n. 1 (C.A.9 1995), cert. denied, 516 U.S. 1093, 116 S.Ct. 815, 133 L.Ed.2d 759 (1996) ; Association of Community Organizations for Reform Now (ACORN) v. Edgar, 56 F.3d 791, 793 (C.A.7 1995). We resolve this case on the theory on which it has hitherto been litigated: that citizenship (not registration) is the voter qualification Arizona seeks to enforce. See Brief for State Petitioners 50.

We are aware of no rule promulgated by the EAC preventing a renewed request. Indeed, the whole request process appears to be entirely informal, Arizona's prior request having been submitted by e-mail. See App. 181.
The EAC currently lacks a quorum-indeed, the Commission has not a single active Commissioner. If the EAC proves unable to act on a renewed request, Arizona would be free to seek a writ of mandamus to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). It is a nice point, which we need not resolve here, whether a court can compel agency action that the agency itself, for lack of the statutorily required quorum, is incapable of taking. If the answer to that is no, Arizona might then be in a position to assert a constitutional right to demand concrete evidence of citizenship apart from the Federal Form.

The EAC recently approved a state-specific instruction for Louisiana requiring applicants who lack a Louisiana driver's license, ID card, or Social Security number to attach additional documentation to the completed Federal Form. See National Mail Voter Registration Form, p. 9; Tr. of Oral Arg. 57 (United States).
* * *