**SECOND DIVISION
BARNES, P. J.,
BOGGS and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**October 13, 2016**

# In the Court of Appeals of Georgia

A16A1270. HAMPTON v. THE STATE.

BARNES, Presiding Judge.

A jury convicted Justin Kyle Hampton of trafficking in methamphetamine, and the trial court sentenced him to serve 20 years in prison, followed by 10 years on probation. He appeals, arguing that the trial court erred in denying his Sixth Amendment right to confront witnesses against him by refusing to let him call the State's informant as a witness to testify regarding Hampton's defense of entrapment, on which the trial court charged the jury. Hampton also argues that the trial court erred in refusing to allow him to see the transcript of the court's in-camera hearing with the informant, that his counsel was ineffective, and that the evidence was insufficient. While we find the evidence sufficient to sustain the judgment of conviction, for the reasons that follow, the trial court erred in refusing to allow

Hampton to call the known informant as a witness. Because Hampton has shown harm as well as error, we reverse.

1. On appeal, we review the evidence in the light most favorable to the jury's verdict to determine whether the State presented sufficient evidence for a rational trier of fact to find the defendant guilty of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979); *Hardin v. State*, 277 Ga. 242 (1) (587 SE2d 634) (2003). The jury resolves conflicts in the testimony and weighs and draws reasonable inferences from the evidence, and we will uphold the verdict if some competent evidence is presented that supports each fact necessary to make out the State's case. *Lomax v. State*, 319 Ga. App. 693 (738 SE2d 152) (2013).

So viewed, the evidence showed that Hampton's employer asked him to put together a drug deal for a friend to buy 28 grams of methamphetamine for $1,400. Hampton's employer was actually an informant and the informant's "friend" was an undercover agent with a local drug task force. Hampton called an acquaintance, David Thompson, who contacted Dwayne Eddie Collett and reported back to Hampton that he and Collett could meet him that afternoon in Fayette County to complete the sale.

The case agent who oversaw the informant was not ready that afternoon to organize a $1,400 "buy-bust" of 28 grams of methamphetamine, and the informant asked Hampton to reset the sale for the following afternoon. Hampton and his contact Thompson agreed to meet at a Fayette County convenience store the next day at 2:00 pm. The informant and undercover agent met with the case agent at the sheriff's office, and the undercover agent then drove the informant to the store, where they met Hampton. The three men waited for the sellers in the undercover agent's truck for almost three hours before the agent finally decided to call the deal off. The State secretly recorded the conversation while they waited, and most of that recording was played for the jury.

About 30 minutes after the undercover agent called off the deal, Hampton received a phone call from the sellers, who were at the convenience store ready to make the sale. Hampton called the informant, who contacted the case agent, who decided there was not enough time to set up a buy-bust and that therefore the informant did not need to be present. Instead, the case agent decided he had enough evidence to arrest "the subjects that are involved in this situation."

While the officers were en route to the convenience store, they passed Hampton walking back and decided to watch and see if he made contact with the sellers,

3

Thompson and Collett. Thompson got out of his vehicle and met Hampton at the front door of the convenience store, then returned to the driver's seat while Hampton went inside. The officers moved in with lights and sirens and Thompson fled on foot, but was caught a short distance away. In the area where he was caught, the officers found a bag containing 26.26 grams of methamphetamine.

Collett did not run, and the officers found another bag containing almost 12 grams of methamphetamine in the car, and several small bags of methamphetamine as well as several alprazolam pills in Collett's pockets. The officers recovered 5 bags of methamphetamine at the arrest scene that contained a total of 40.54 grams, the largest bag being the one found near Thompson. Hampton left the store by the back door and was arrested a week later.

Collett, Thompson, and Hampton were charged with trafficking in methamphetamine for possessing more than 28 grams of a mixture containing the controlled substance. Collett was also charged with possession of alprazolam, and Thompson was charged with obstruction and hindering law enforcement by refusing an officer's lawful commands. As of Hampton's trial, Collett and Thompson had pled guilty and were sentenced respectively to 15 years to serve and 15 years to serve 10 in custody. Neither testified at Hampton's trial.

The statute in effect in November 2011, when the crime occurred, former OCGA § 16-13-31 (e), provided that "[a]ny person who knowingly sells, delivers, or brings into this state or has possession of 28 grams or more of methamphetamine . . . as described in Schedule II, in violation of this article commits the felony offense of trafficking." The State concedes that Hampton never had actual possession of the drugs, and Hampton concedes the evidence is sufficient to show he had constructive possession of the 26.26 grams of methamphetamine discovered near the area where Thompson was apprehended. Hampton argues that the evidence was not sufficient to establish he also had constructive possession of the methamphetamine found in Collett's car or on his person, and therefore he did not knowingly possess the 28 grams required for a trafficking conviction.

> The plain language of the version of former OCGA§ 16-13-31 [e][1] at issue dictates the conclusion that knowledge of the quantity of the drug was an element of the crime. It contains express scienter requirements, that is, knowledge of the nature and amount of the drug and of being in possession of it. And, certainly where "knowledge" is made part of an

[1]The version of the statute applicable to Hampton was effective July 1, 2003 to June 30, 2012. Ga. L. 2003, p. 177, § 4 The statute was amended, effective July 1, 2012 to June 30, 2013, and its present version became effective July 1, 2013. Ga. L. 2012, p. 899, § 3-8/HB 1176; Ga. L. 2013, p. 222, § 4/HB 349.

5

offense, the State has the burden to prove the defendant's guilty knowledge.

*Scott v. State*, 295 Ga. 39, 40 (1) (757 SE2d 106) (2014).

The evidence as outlined above showed that Hampton made phone calls to Thompson to arrange for the informant to buy 28 grams of methamphetamine. Thompson and Collett came to the pre-arranged meeting location with more than 28 grams in their possession. While Hampton argues that only 26.26 grams was delivered to support the sale in which he was involved, the evidence did not demand such a finding. The jury could also infer that Thompson and Collett brought some of the additional methamphetamine in case the buyer insisted on delivery of the full weight for which he had bargained. The evidence as outlined was sufficient for a rational trier of fact to find Hampton in constructive possession of at least 28 grams of methamphetamine and therefore guilty of trafficking. *Hardin*, 277 Ga. at 242 (1).

2. Hampton argues that the trial court denied him his Sixth Amendment right to confront witnesses against him by not allowing him to call the informant, his employer, as a witness. His defense was entrapment, and he filed motions before trial both to reveal the identity of the informant and to compel the State to produce the informant as a witness. The State represented to the trial court that Hampton's motion

6

to compel production was encompassed completely by his motion to disclose the informant's identity. While the State responds on appeal that the trial court properly denied Hampton's motion to compel disclosure of the identity of its "confidential informant," Hampton knew the identity of the informant. It was the man who employed him, who had to be removed from the courtroom twice before the parties argued Hampton's motions, and who appeared in an almost-three-hour video introduced by the State in its case-in-chief. The issue is whether Hampton should have been allowed to call the informant and question him related to Hampton's entrapment defense.

> The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer. However, a different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.

*Sherman v. United States*, 356 U.S. 369, 372 (78 SCt 819; 2 LE2d 848) (1958) (citations and punctuation omitted).

7

"[T]he entrapment defense consists of three distinct elements: (1) the idea for the commission of the crime must originate with the state agent; (2) the crime must be induced by the agent's undue persuasion, incitement, or deceit; and (3) the defendant must not be predisposed to commit the crime. OCGA § 16-3-25[.]" *Keaton v. State*, 253 Ga. 70, 71-72 (316 SE2d 452) (1984). If a defendant raises the affirmative defense of entrapment, he must generally admit that the act charged was committed, unless it is the State that injects evidence of entrapment and the defendant insists he did not commit the crime charged. *Gregoroff v. State*, 248 Ga. 667 (285 SE2d 537) (1982) (physician denied having prescribed controlled substances without a legitimate medical purpose).

Even if a defendant knows or suspects who the informant is, "the public and the informant have a clear interest which can . . . be protected even when the informant's identity has been disclosed or discovered." *State v. Mason*, 181 Ga. App. 806, 809 (3) (353 SE2d 915) (1987), overruled in part on other grounds, *Watts v. State*, 274 Ga. 373, 375 (1) (552 SE2d 823) (2001). The purpose behind the government's privilege to prevent the informant from testifying "is the furtherance and protection of the public interest in effective law enforcement" by allowing citizens to remain anonymous and thus encourage them to fulfill their obligation "to

communicate their knowledge of the commission of crimes to law-enforcement officials. . . . But [t]he scope of the privilege is limited by its underlying purpose." *Roviaro v. United States*, 353 U.S. 53, 59-60 (77 SCt 623, 1 LE2d 639) (1957).

Our Supreme Court analyzed the confidential informant disclosure issue under both *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194; 10 LE2d 215) (1963) (disclosure of evidence favorable to defendant required if material to guilt or punishment) and *Roviaro*, 353 U.S. 53 (balancing government interests against defendant's rights and concluding that, under facts presented, government was required to disclose informant's name at trial). *Thornton v. State*, 238 Ga. 160 (231 SE2d 729) (1977). The Court observed that

> the basis of both *Brady* and *Roviaro* is fundamental fairness to the accused. Therefore, they must be read together where, as here, the question is disclosure of the identity of the state's informer-witness or informer-participant if material to the defense on the issue of guilt or punishment. When such an informer's identity is required under the standards set forth in *Brady*, the trial court must go further and weigh the materiality of the informer's identity to the defense against the state's privilege not to disclose his name under *Roviaro*.

*Thornton*, 238 Ga. at 164-165 (2). "Where a defendant charges that a confidential informant has entrapped him outside the presence of any other witnesses, *Roviaro*

9

would ordinarily require disclosure of the informant's identity, since the defense of entrapment would rest upon allegations which only the informant could confirm or deny." (Footnote omitted.) *State v. Royal*, 247 Ga. 309, 312 (2) (275 SE2d 646) (1981); *Griffiths v. State*, 283 Ga. App. 176, 177-178 (1) (641 SE2d 169) (2006).

When this case was called for trial, Hampton noted that he had a pending motion to reveal the identity of the "confidential informant," his defense being that the informant had threatened his job unless he found a local methamphetamine connection. The State responded that Hampton had the burden of proving both the materiality and the necessity of the witness's testimony for his entrapment defense, and to rebut that argument, the State introduced a video of the informant, the undercover agent, and Hampton that was recorded while they waited in the agent's truck for almost three hours for the sellers to show up. The State then called the informant's case agent, who testified about his participation in the setup and confirmed that he had not been privy to conversations between the informant and Hampton and had no personal knowledge about whether the informant made threats to or coerced the informant into setting up the deal.

The parties argued at length about Hampton's entrapment defense. Hampton proffered that the conversations he had with the informant were conducted outside

10

the privy of the State, that the informant originated the idea of the crime, and that but for the informant's undue influence and duress, Hampton would never have committed the act. He further proffered that Hampton had a tenth grade education, that he had difficulty finding employment, and that the informant had threatened to withhold work from Hampton unless he found a local methamphetamine connection for the informant.

The trial court conducted an in-camera hearing with the informant and the State, absent the defendant and his counsel, to determine whether to grant Hampton's request to reveal the informant's name at trial and compel the State to produce the informant as a witness. The trial court conducted most of the examination during the in camera hearing, and in response to the trial court's direct questions, the informant denied planting the idea to commit the crime in Hampton's mind. He admitted that Hampton came to him looking for work and that he had given him a few days of work. He also testified that he had known Hampton for about eight years, and added, "But I went the wrong way and started doing time. And then he started doing a lot of pills and stuff."

The informant further testified that, in his capacity as an informant, he had previously told Hampton to let him know if Hampton knew where he could "get

11

anything at," and that Hampton "kept saying I got somebody, I can bring it." The informant admitted that, while waiting for the sellers to show up with the drugs, he told Hampton, "man, if these people don't show up — because he's going to make me look bad in front of them — then I said I'm going to work you an extra day for 5 dollars or something like that. I was just playing with him."

The trial court asked the informant if he was testifying that it was not his idea to procure the methamphetamine, and he responded,

> I wasn't on him like that. I mentioned it to him, you know where can we get some of that good stuff, and — some ice or something, because I do work for [the case agent] and them. And he said I can get some; I can get some of it. And then I just — I said well, okay, let's finish this job. Went to the next job; and he said I made that call, I can get it. I was like, man, I ain't talking about no nickel and dime stuff. And then he kept pursuing it from there.

The State asked the informant if he had ever arranged a deal with Hampton before or known of him to deal drugs, and the informant replied that he had bought pills from Hampton before, who had acted as a go-between or broker. The informant denied thinking that he would personally benefit from having Hampton set up the deal, because he *thought* that his latest Fayette County offense — having pawned a neighbor's lawn equipment without permission — had been resolved by then. He also

testified that his name was "crap" in the county because people knew he was an informant, and that had been severely beaten a year before the trial by eight or nine men, including the nephew of a man the informant had set up.

When the parties returned to court the next morning, the trial court ruled from the bench, noting first that once Hampton presented evidence of entrapment, the burden shifted to the State to prove there was no entrapment. The court found that, based on the informant's in camera testimony, evidence from him would be inculpatory, not exculpatory, and further noted that the jury would be able to see the informant, Hampton, and the undercover agent interact during the video recording.

The State then presented its case in chief to the jury, which consisted of the testimony of the case agent, the video recording of Hampton, the informant, and the undercover agent waiting in the agent's truck, the testimony of a deputy sheriff about chain of custody, and the testimony of a forensic chemist about the weight and composition of the methamphetamine placed in evidence. After the State rested and the trial court denied Hampton's motion for a directed verdict of acquittal, Hampton testified.

Hampton testified that he had never sold or taken methamphetamine before, but set up this methamphetamine deal because his employer, the informant, told him that

13

if he did not do so, the informant would not employ him any more, and Hampton needed the job so he could feed himself. Hampton, who was 22 when the incident took place, said he began working part-time for the informant in October 2011. He explained that his father died when he was 2, his mother died when he was 10, and the aunt he had gone to live with kicked him out of her house when he was 17. He slept in couches and friend's cars, quit school, and began working full-time. He described his economic difficulties, and said that in fall 2011, when his usual work cutting grass was unavailable, he began working for the informant a couple of days a week for $60 to $100 cash until he could join the Army the following summer. He testified that the informant initially asked him if he knew where to get "pills and stuff," and that he replied he did not "mess with" anything like that any more. He admitted that he used to smoke marijuana and take pills, and that he had sold some of his personal stash to friends at cost, but denied ever making a profit selling drugs. He also denied selling, using, or even seeing methamphetamine before the trial, and testified he had not expected to make any money on the deal he set up for the informant.

Hampton testified that the first time the informant asked him if he knew where to find some methamphetamine was the day before the drug bust took place. In

14

response, Hampton said he asked the informant if he was using drugs, because the informant used to be a crack addict and Hampton did not want to ride around with him if he was carrying drugs. The informant said he was looking for a friend who wanted to find a local connection for methamphetamine by the ounce. Hampton testified that he asked why the informant would be talking to someone who wanted to find that drug and said he should tell his friend to "get lost."

Hampton further testified that the informant responded that it was important for him to help his friend make a connection, and when Hampton again said he did not know anyone, the informant "started to get frustrated." According to Hampton, the informant finally said, "Justin, I'm helping you with a job. If you don't help me find my friend a new connection, then I'm not going to work you. You're no good to me." Hampton testified that he believed that the informant would not give him any work if he did not find someone to sell the informant's friend an ounce of methamphetamine, and that he needed the job to feed himself because no one else was going to take care of him. He called a friend who knew someone who sold pills and asked if the friend knew anyone who could find methamphetamine for his boss's friend. Hampton's friend gave him the phone number of a girl named Chris, whose boyfriend was David Thompson. Thompson said he thought his guy "Eddie" could

15

get an ounce of methamphetamine. Thompson checked and called Hampton back to set up a time and place for the sale.

Hampton admitted that while he waited with the informant and undercover agent for the sellers to show, he tried to impress both men by saying he used to sell drugs. He also testified that after the undercover agent called off the deal, the informant cussed at him on the phone for wasting his friend's time and hung up on him, although his attitude was different when Hampton called back to say the sellers had finally arrived at the agreed-upon meeting place. The informant told Hampton to return to the store and introduce the informant's friend to the seller. After Hampton returned to the store, he identified Thompson's truck over the phone to the informant's friend and briefly met with Thompson at the door to the store. Hampton then went inside, bought a drink, and left through the back door, he said, never having seen the cops who arrived then to arrest Thompson and Eddie Collett.

After Hampton rested, his trial counsel asked the trial court for a copy of the court's written order denying his motion to reveal the informant so he could address the trial court's findings when he argued his renewed motion, but the order had not been finalized. The court added that the video recording had been a key factor in its decision to deny Hampton motion, finding that the video weighed against the need

16

for the informant's testimony.[2] Hampton argued that the entrapment occurred before the recording and that no evidence rebutted his testimony about his job being threatened. The State responded that Hampton admitted having previously exchanged drugs for money, which was sufficient to establish his predisposition to sell drugs, and that his statements on the video were inconsistent with his entrapment defense. The trial court denied the renewed motion. In its instructions, the court charged the jury on Hampton's affirmative defense of entrapment, including the proposition that the State had the burden of proving beyond a reasonable doubt that Hampton had not been entrapped.

After deliberating for almost an hour, the jury asked the court to recharge them on the definition of parties to a crime and entrapment. After the trial court did so, the jury deliberated for another 15 minutes and returned a verdict of guilty.

The issue in this case is not whether the trial court erred in declining to require the State to identify the informant. Hampton knew who the informant was. The informant's identity was also known to the jury, who watched the informant onscreen during the lengthy video recording of him sitting with Hampton and the undercover agent. In fact, the informant had come into the courtroom twice and had to be

---

[2]The record does not contain a written order.

17

removed. The issue is whether the trial court erred in finding that the State's interest in preventing the informant from testifying outweighed Hampton's right to compel the attendance of the only witness besides Hampton who had evidence related to Hampton's entrapment defense.

The informant's testimony was material to Hampton's entrapment defense, as it was the only source of evidence about it other than Hampton himself. Further, the informant was *not* a "mere tipster" — "one who provides information about criminal activity" and whose relevant testimony would be inadmissible hearsay, but a "'decoy' — a person used to obtain evidence (the informer-participant) or to establish facts (the informer-witness) upon which to base a prosecution." *Thornton*, 238 Ga. at 163. See also *Wingfield v. State*, 159 Ga. App. 69, 71 (282 SE2d 713) (1981) (defendant had right to compel attendance of informant who was not a mere tipster, "whose cover had been blown," whose picture was in evidence, and whose testimony was highly material to defendant's only defense of misidentification). The informant here testified in camera that he brought up the subject of drug sales in the first place, that he told Hampton not to set up "no nickel and dime stuff," and that he threatened to work Hampton for $5 a day if the sellers did not show up. The informant was not even sure if he had been in trouble with the county when he orchestrated this deal.

18

Neither the trial court nor the State questioned the informant during the in camera hearing about any quid pro quo he received for his facilitation of the drug deal.

> The Sixth Amendment to the U. S. Constitution guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. The main and essential purpose of the right of confrontation is to secure for the opponent the opportunity of cross-examination. The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony. This principle is particularly important with witnesses who have substantial incentives to cooperate with the government. . . . Accordingly, defense counsel is entitled to a reasonable cross-examination on the relevant issue of whether a witness entertained any belief of personal benefit from testifying favorably for the prosecution.

*Manley v. State*, 287 Ga. 338, 340 (2) (698 SE2d 301) (2010) (citation and punctuation omitted). While the trial court retains wide latitude to impose reasonable limits on such an examination, id., in this case the defendant had no opportunity to question the informant about his partiality as it might affect his testimony about whether he coerced Hampton into setting up the deal. Hampton's conduct and statements during the video may be relevant to his credibility, but it is not the only proof of whether he set up the deal under duress.

19

Further, post-trial counsel moved the court for both a copy of the in-camera transcript and to compel the attendance of the informant at the new trial hearing to establish what kind of benefits he might have obtained from the police while working as an informant, but the trial court denied both motions.

Hampton must show harm as well as error to obtain a new trial. *Moore v. State*, 187 Ga. App. 387, 392 (2) (370 SE2d 511) (1988).

> In *Roviaro*, the Supreme Court, after applying the balancing test, held that it was prejudicial error not to reveal the informant's identity where the informant was the sole participant, other than the accused, in the transaction and, thus, "was the only witness in a position to *amplify or contradict* the testimony of government witnesses." (Emphasis supplied.) Id. at 64. Further, although the defendant in *Roviaro* was not in a position to interview the unidentified informant (decoy) and thereby ascertain the anticipated scope and content of his testimony, the Supreme Court concluded that "[t]he circumstances of this case demonstrate that [the informant's] *possible* testimony was highly relevant and might have been helpful to the defense." (Emphasis supplied.) Id. at 63-64.

Id. at 388-389 (2).

Here, the informant himself testified in camera that his identity as an informant for the police was well-known in Fayette County and that he had been severely beaten

a year before because of his informant activities. Thus, the government no longer has an overriding interest in maintaining the informant's anonymity to continue securing the flow of information from him. See *Roviaro*, 353 U.S. at 60 ("The scope of the privilege is limited by its underlying purpose. Thus, ... once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.")

Although the informant denied during the in camera hearing that the idea for committing the crime originated with him and denied that he used undue persuasion or incitement to induce Hampton to set up the methamphetamine sale, Hampton testified otherwise. As the Georgia Supreme Court observed, "if the confidential informant acts as the entrapper, and if the defendant can show that he has an arguably persuasive defense of entrapment — the [S]tate might have a duty to produce such a witness." *Boatright v. State*, 260 Ga. 534, 536 (397 SE2d 689) (1990). Hampton obviously made an arguably persuasive case of entrapment, as the trial court charged the jury on the defense. Further, the trial court's conclusion that the informant's testimony was inculpatory, not exculpatory, is not dispositive. Regardless of whether the informant disputes or corroborates Hampton's testimony, Hampton is entitled

under *Roviaro* to confront the informant and let a jury determine the relative credibility of both men.

Accordingly, because the trial court erred in not granting Hampton's motion to compel the State to produce the informant to testify at trial, we must reverse the conviction and remand for a new trial.

3. Hampton' remaining enumerations of error are without merit or unlikely to arise upon retrial.

*Judgment reversed. Boggs and Rickman, JJ., concur.*