**THIRD DIVISION**
**DILLARD, C. J.,**
**GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 21, 2019**

# In the Court of Appeals of Georgia

A19A0638. CAWTHON v. THE STATE.

DILLARD, Chief Judge.

Kristopher Cawthon appeals his conviction for abuse of a disabled adult, arguing that there was insufficient evidence to support the verdict; and that the trial court erred in (1) denying his motion for a directed verdict; (2) ruling that knowledge is not an essential element of his offense; (3) allowing a witness to speculate as to his state of mind; and (4) denying his motion for a mistrial. For the reasons set forth *infra*, we affirm.

Viewed in the light most favorable to the jury's verdict,[1] the record shows that H. R., the victim, was born with a disability, and at the time of the relevant events, she was 31 years old and had always lived with her parents. According to her father,

---

[1] *See, e.g.*, *Morris v. State*, 340 Ga. App. 295, 295 (797 SE2d 207) (2017).

H. R. did not begin walking until she was three years old, and she did not start talking until she was between three-and-a-half and four years old. During her childhood, H. R. was a slow learner and "didn't know a lot of things like other children did." And as an adult, H. R. does not have a job, but she helps her mother, who is blind, with "little chores around the house[.]" In her free time, H. R. watches cartoons and Disney movies, and she also "does a lot of pretending" with dolls. Additionally, H. R.'s parents provide her with, *inter alia*, housing, food, clothing, medicine, and transportation. Indeed, H. R. does not drive, has never had a license, and is even afraid to ride a bicycle. And while H. R. receives government benefits and has a checking account, the account is in her mother's name because she is not capable of managing her own financial affairs.

In early 2016, Cawthon moved in with S. W., one of H. R.'s neighbors in the trailer park where she lived, and shortly thereafter, S. W. and H. R. became acquainted. After they met, H. R. would stop by S. W.'s trailer occasionally to see her baby and bring him toys. But when H. R. learned that Cawthon was living with S. W., H. R. began coming over every day because she "kind of liked him a lot." At some point after meeting him, H. R. began sending Cawthon "friendly" Facebook messages, and for several weeks, Cawthon did not respond. But eventually, on March

27, 2016, Cawthon sent H. R. a message that said, "Boo. Hang out? Are you trying to get me naked?" When H. R. responded that she only wanted to hang out and talk to him, Cawthon told her that he was a "sex addict." H. R. and Cawthon continued to exchange Facebook messages for the next couple of weeks, but Cawthon told H. R. not to tell anyone that they were messaging each other.

On April 5, 2016, Cawthon sent a message to H. R., telling her that he wanted to have sex with her. Although H. R. told Cawthon that she did not want to do that, she went to his trailer sometime after midnight to "[j]ust talk to him as friends." When Cawthon started asking H. R. "weird like questions about sex and stuff[,]" she told him that she was a virgin and did not want to have sex. Despite H. R.'s insistence that she did not want to have sex, Cawthon brought her into his room and forced her to touch his penis. Cawthon then held her down on the floor, pulled her pants down, and penetrated her vagina with his penis. During the attack, H. R. cried and tried to fight back, but Cawthon overpowered her. When Cawthon was finished, he told H. R. not to tell anyone what happened, and she went home.

In the days following the assault, H. R.'s parents learned about the attack and reported it to law enforcement. Then, after an investigation into the matter, Cawthon was charged, via indictment, with rape and abuse of a disabled adult. Following a jury

3

trial, he was acquitted of rape, but convicted of abuse of a disabled adult. Thereafter, Cawthon filed a motion for a new trial, which he later amended twice; and following a hearing, the motion was denied. This appeal follows.

Prior to considering Cawthon's claims of error, we first note that the deficiencies in his brief have hindered our review of his appeal. Specifically, his statement of facts, purporting to summarize his 3-day jury trial—at which nine witnesses testified and 71 exhibits were submitted—is a single-page long and references only five pages of the trial transcript and two exhibits. Suffice it to say, this fails to comply with our rules. Indeed, Georgia Court of Appeals Rule 25 (a) (1) requires appellants to provide "a succinct and accurate statement of . . . the material facts relevant to the appeal . . . [and] a citation to the parts of the record or transcript essential to a consideration of the errors . . . ." And given that Cawthon challenges, *inter alia*, the sufficiency of *all* the evidence presented at trial to support his conviction, his cursory statement of facts, largely unsupported by record or transcript citations, fails to set forth all of the material facts relevant to at least that claim of error. Similarly, the argument sections of Cawthon's brief dedicated to each enumeration of error likewise include scant record and transcript citations, if any at all. Thus, Cawthon's brief also violates Georgia Court of Appeals Rule 25 (c) (2) (i),

4

which provides that "[e]ach enumerated error *shall* be supported in the brief by specific reference to the record or transcript."[2] And absent such specific references, "[this] Court *will not* search for and *may not* consider that enumeration."[3]

As we have repeatedly cautioned litigants, it is not the function of this Court to "cull the record on behalf of a party in search of instances of error[.]"[4] Instead, the burden is upon the party alleging error to "show it affirmatively in the record."[5] Needless to say, Cawthon has failed to satisfy this burden. Nevertheless, because Cawthon's brief is not entirely devoid of citations to the record and the evidence is relatively straightforward, we exercise our discretion and will attempt (when possible) to consider his appeal on the merits based on our independent review of the

---

[2] (Emphasis supplied).

[3] Court of Appeals Rule 25 (c) (2) (i) (emphasis supplied).

[4] *Guilford v. Marriott Int'l, Inc.*, 296 Ga. App. 503, 504 (675 SE2d 247) (2009) (punctuation omitted); *see Harris v. State*, 256 Ga. App. 120, 122 (2) (567 SE2d 394) (2002) ("[W]e have repeatedly held that it is not the function of this court to cull the record on behalf of a party." (punctuation omitted)); *Dixon v. Metro. Atlanta Rapid Transit Auth.*, 242 Ga. App. 262, 266 (4) (529 SE2d 398) (2000) ("[A]ppellate judges should not be expected to take pilgrimages into records in search of error without the compass of citation and argument." (punctuation omitted)).

[5] *Guilford*, 296 Ga. App. at 504 (punctuation omitted); *accord Fleming v. Advanced Stores Co.*, 301 Ga. App. 734, 735 (688 SE2d 414) (2009).

record and with the aid of the citations provided by the State.[6] But if we have missed something in the record or misconstrued an argument, "the responsibility rests with [Cawthon's] counsel."[7] Finally, we note that our requirements as to the form of appellate briefs were created, "not to provide an obstacle, but to aid parties in presenting their arguments in a manner most likely to be fully and efficiently comprehended by this Court."[8] With the foregoing in mind, we turn now to the merits of Cawthon's appeal.

1. In his first three claims of error, Cawthon argues that the evidence was insufficient to support his conviction, the trial court erred in denying his motion for a directed verdict, and the trial court erred in finding that knowledge is not an element of his offense. We disagree.

---

[6] *See, e.g.*, *Paden v. Rudd*, 294 Ga. App. 603, 604 (1) (669 SE2d 548) (2008) (exercising discretion to consider the merits of an appeal when, although the appellant failed to provide proper record citations in her brief, the record was fairly small and the appellees provided sufficient record citations); *Arnold v. State,* 262 Ga. App. 61, 61 (1) (584 SE2d 662) (2003) (exercising discretion to consider merits of a challenge to sufficiency of the evidence to support a conviction even though the appellant abandoned that claim by, *inter alia*, failing to cite to the record or legal authority).

[7] *Brittain v. State*, 329 Ga. App. 689, 693 (2) (766 SE2d 106) (2014) (punctuation omitted); *accord Adams v. State*, 322 Ga. App. 782, 784 (1) (746 SE2d 261) (2013).

[8] *Swain v. State*, 268 Ga. App. 135, 136-37 (1) (601 SE2d 491) (2004).

6

We review the denial of a motion for directed verdict "under the same standard as that for determining the sufficiency of the evidence to support a conviction."[9] And when a criminal conviction is appealed, the evidence must be viewed "in the light most favorable to the verdict, and the appellant no longer enjoys a presumption of innocence."[10] In evaluating the sufficiency of the evidence to support a conviction, we do not weigh the evidence or determine witness credibility but only resolve whether "a rational trier of fact could have found the defendant guilty of the charged offenses beyond a reasonable doubt."[11] Accordingly, the jury's verdict will be upheld so long as "there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case."[12] With these guiding principles in mind, we turn now to Cawthon's specific challenge to the sufficiency of the evidence to support his conviction.

---

[9] *Jordan v. State*, 322 Ga. App. 252, 253 (2) (744 SE2d 447) (2013).

[10] *Howard v. State*, 340 Ga. App. 133, 136 (1) (796 SE2d 757) (2017); *see Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

[11] *Howard*, 340 Ga. App. at 136 (1) (punctuation omitted); *accord Joiner v. State*, 299 Ga. App. 300, 300 (682 SE2d 381) (2009); *see Jackson*, 443 U.S. at 319 (III) (B).

[12] *Howard*, 340 Ga. App. at 136 (1) (punctuation omitted); *accord Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001).

(a) *Disability*. Cawthon first argues that, while H. R. was an adult at the time of the attack, the State failed to prove she was disabled. But in doing so, he cites only to the statutory definitions of "disabled adult" and "mentally or physically incapacitated" set forth *infra*, and details his version of the evidence presented at trial without a single citation to the record, trial transcript, or exhibits. Cawthon then summarily asserts that, under those statutory definitions, "[H. R.] is not a disabled adult." As previously noted, this Court will not typically address arguments in the complete absence of record and transcript citations.[13] Furthermore, an assertion of error followed by a legal citation is not legal analysis, which is, at a minimum, "a discussion of the appropriate law as applied to the relevant facts."[14] Nevertheless, given the significant liberty interests at stake and the straightforward nature of the evidence presented, we will address this issue.

Here, the indictment charged Cawthon

with the offense of ABUSE OF A DISABLED ADULT for that . . . [Cawthon] . . . on or about the 6th day of April, 2016, did willfully inflict physical pain, sexual abuse, mental anguish[,] and unreasonable

---

[13] *See supra* notes 2-6 & accompanying text.

[14] *Swain v. State*, 268 Ga. App. 135, 136 (1) (601 SE2d 491) (2004) (punctuation omitted).

confinement upon [H. R.], a disabled adult, by locking the door to his residence to prevent her from leaving, taking her to his bedroom, pushing her to the floor, feeling her breasts, pulling her pants down, touching her pubic area, pushing her panties to one side and inserting his penis into her vagina and engaging in sexual intercourse with her until he ejaculated inside her, all while [she] was crying, telling him to stop[,] and trying to push him off of her and then telling her not to tell anyone . . . .

OCGA § 16-5-102 (a) provides, in relevant part:

Any person who knowingly and willfully exploits a disabled adult, elder person, or resident, *willfully inflicts physical pain, physical injury, sexual abuse, mental anguish, or unreasonable confinement upon a disabled adult*, elder person, or resident, or willfully deprives of essential services a disabled adult, elder person, or resident shall be guilty of a felony . . . .[15]

And under OCGA § 16-5-100 (3), "'[d]isabled adult' means a person 18 years of age or older who is mentally or physically incapacitated . . . ." Furthermore,

"[m]entally or physically incapacitated" means an impairment which substantially affects an individual's ability to: (A) Provide personal protection; (B) Provide necessities, including but not limited to food,

---

[15] (Emphasis supplied).

9

shelter, clothing, medical, or other health care; (C) Carry out the activities of daily living; *or* (D) Manage his or her resources.[16]

Here, the State presented evidence that because H. R. could not provide basic necessities for herself, she lived with her parents, who provided her with food, shelter, clothing, healthcare expenses, and transportation. Indeed, H. R.'s father testified that, while H. R. received certain government benefits, she was unable to manage her own financial affairs, and as a result, her mother did so for her. Additionally, a licensed psychologist testified that he evaluated H. R. on January 9, 2012, just over a year before the attack, and determined that she "had a full scale IQ score of 67." To put that score in context, the Supreme Court of Georgia has advised that IQ scores between 70 and 84 indicate "borderline intellectual functioning[.]"[17] H. R.'s IQ score, then, was *below* the range of scores that indicate borderline intellectual functioning. In sum, H. R.'s inability to provide for herself and manage her financial resources combined with her low IQ score constituted sufficient

---

[16] OCGA § 16-5-100 (7.1).

[17] *Rogers v. State*, 282 Ga. 659, 660 (1) (653 SE2d 31) (2007).

10

evidence to support the jury's conclusion that she was mentally or physically incapacitated during the relevant time period.[18]

(b) *Knowledge.* Cawthon also argues that the trial court erred in finding that his knowledge of H. R.'s disability is not an essential element of his offense.

When interpreting any statute, we necessarily begin our analysis with "familiar and binding canons of construction."[19] In considering the meaning of a statute, our charge is to "presume that the General Assembly meant what it said and said what it

---

[18] *See Smith v. State*, 311 Ga. App. 757, 760-61 (2) (a) (ii) (717 SE2d 280) (2011) (holding that the trial court did not err in finding that the victim was disabled when she read at a first or second-grade level, did not understand monetary denominations, needed help with feminine hygiene, had an IQ well below 70, and generally could not care for herself); OCGA § 16-5-100 (7.1) (providing, *inter alia*, that a mentally incapacitated person is an individual who experiences an impairment which substantially affects his or her ability to provide necessities, including but not limited to food, shelter, clothing, medical, or other health care; carry out the activities of daily living *or* manage his or her resources); *see also Moore v. Texas*, ___ U. S. ___, ___ (I) (137 SCt 1039, 197 LE2d 416) (2017) (describing the "generally accepted, uncontroversial intellectual-disability diagnostic definition," and noting that it "identifies three core elements: (1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean—*i.e.*, a score of roughly 70—adjusted for 'the standard error of measurement,'); (2) adaptive deficits (the inability to learn basic skills and adjust behavior to changing circumstances); and (3) the onset of these deficits while still a minor." (punctuation and citations omitted)).

[19] *Holcomb v. Long*, 329 Ga. App. 515, 517 (1) (765 SE2d 687) (2014); *accord In the Interest of L. T.*, 325 Ga. App. 590, 591 (754 SE2d 380) (2014).

meant."[20] And toward that end, we must afford the statutory text its plain and ordinary meaning,[21] consider the text contextually,[22] read the text "in its most natural and reasonable way, as an ordinary speaker of the English language would,"[23] and seek to "avoid a construction that makes some language mere surplusage."[24] Further, when the language of a statute is "plain and susceptible to only one natural and reasonable construction, courts must construe the statute accordingly."[25]

---

[20] *Holcomb*, 329 Ga. App. at 517 (1) (punctuation omitted); *accord Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013).

[21] *Holcomb*, 329 Ga. App. at 517 (1); *accord Deal*, 294 Ga. at 172 (1) (a).

[22] *Holcomb*, 329 Ga. App. at 517 (1); *see also Arizona v. Inter Tribal Council of Arizona, Inc*., ___ U.S. ___ (II) (B) (133 SCt 2247, 186 LE2d 239) (2013) (Scalia, J.) ("Words that can have more than one meaning are given content, however, by their surroundings." (punctuation and citation omitted)); *Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it appears[.]").

[23] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *accord Zaldivar v. Prickett*, 297 Ga. 589, 591 (774 SE2d 688) (2015); *FDIC v. Loudermilk*, 295 Ga. 579, 588 (2) (761 SE2d 332) (2014).

[24] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *accord In the Interest of L. T.*, 325 Ga. App. at 592; *Kennedy v. Carlton*, 294 Ga. 576, 578 (2) (757 SE2d 46) (2014).

[25] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *see Deal*, 294 Ga. at 173 (1) (a) ("[I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." (punctuation omitted)).

OCGA § 16-5-102 (a) provides, in relevant part:

Any person who *knowingly and willfully* exploits a disabled adult, elder person, or resident, *willfully* inflicts physical pain, physical injury, sexual abuse, mental anguish, or unreasonable confinement upon a disabled adult, elder person, or resident, *or willfully* deprives of essential services a disabled adult, elder person, or resident shall be guilty of a felony . . . .[26]

The plain language of the foregoing statutory provision provides three distinct ways, listed disjunctively, in which someone can commit the crime of abusing a disabled adult. Specifically, a person commits this offense if he (1) exploits a disabled adult; (2) inflicts physical pain, physical injury, sexual abuse, mental anguish, or unreasonable confinement upon a disabled adult; *or* (3) deprives a disabled adult of essential services. OCGA § 16-5-102 (a) also plainly provides that, while exploitation of a disabled adult must be done "knowingly and willfully[,]" the second and third ways in which the offense can be committed require only that the conduct be willful.[27]

---

[26] (Emphasis supplied).

[27] *See generally Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (II) (99 SCt 2326, 60 LE2d 931) (1979) (explaining that "[c]anons of construction ordinarily suggest that terms connected by a disjunctive be given *separate meanings*, unless the context dictates otherwise" (emphasis supplied)).

13

Additionally, as our Supreme Court has explained, the canon of statutory construction known as "the 'rule of the last antecedent,' a qualifying phrase should ordinarily be read as modifying only the noun or phrase that it *immediately* follows."[28] And here, the only phrase *immediately* following the word "knowingly" is "exploits a disabled adult . . . ." Furthermore, given the repeated use of the word "willfully" in OCGA § 16-5-102 (a), construing the phrase "knowingly and willfully" to apply to all descriptions of the offenses set forth in the statute would render the word willfully mere surplusage and meaningless as applied to the second and third descriptions.[29]

In this case, the indictment charged Cawthon with committing abuse of H. R. in the second way in which a person can commit abuse of a disabled adult—by willfully inflicting physical pain, physical injury, sexual abuse, mental anguish, or

---

[28] *Scott v. State*, 299 Ga. 568, 572, 788 SE2d 468, 473 (2016) (punctuation omitted) (emphasis supplied), *quoting Lockhart v. United States*, ___ U.S. ___, ___ (II) (A) (136 SCt 958, 194 LE2d 48) (2016).

[29] *See State v. C. S. B.*, 250 Ga. 261, 263 (297 SE2d 260) (1982) ("[When] possible, we construe language used by the General Assembly in a manner that will not render it meaningless or mere surplusage."); *English v. State*, 282 Ga. App. 552, 554-55 (2) (639 SE2d 551) (2006) (explaining that in construing a statute, this Court gives "each part of the statute meaning and avoid constructions that make some language mere surplusage," and noting that "[a]ll parts of a statute should be harmonized and given sensible and intelligent effect, because it is not presumed that the legislature intended to enact meaningless language).

14

unreasonable confinement upon a disabled adult. And as to his specific conduct, the indictment alleged that he committed the charged offense by locking the door to his residence to prevent her from leaving, taking her to his bedroom, pushing her to the floor, feeling her breasts, pulling her pants down, touching her pubic area, and inserting his penis into her vagina and engaging in sexual intercourse. The indictment makes no allegation that Cawthon "exploited" H. R., which is the only conduct OCGA § 16-5-102 requires to be done knowingly. So, while Cawthon maintains that "[k]nowingly, willfully[,] and intentionally are all basically the same meaning[,]" the Supreme Court of Georgia has expressly rejected that argument,[30] and we do as well. Thus, the trial court did not err in concluding that the portion of OCGA § 16-5-102 (a) that formed the basis for Cawthon's charged offense did not require the State to prove that he knew H. R. was disabled when he attacked her.[31]

---

[30] *See Cox v. Garvin*, 278 Ga. 903, 903 (607 SE2d 549) (2005) (holding that the term "willfully" as used in a criminal statute required only that the defendant intended to commit the offense, but did not include a knowledge requirement).

[31] *See supra* notes 20-26; 28-30 & accompanying text; *see also State v. Mondor*, 346 Ga. App. 612, 615 (2) (816 SE2d 790) (2018) (physical precedent only) (holding that because section (a) of the hit-and-run statute did not require that the defendant know or should have known that the accident caused a death, in part, because section (a) did not use the word knowingly, while section (b) mandated punishment based on the circumstances of the accident and whether the defendant "knowingly" violated the statute).

2. Cawthon next argues that the trial court erred in allowing S. W., who testified for the State, to speculate as to Cawthon's state of mind. Again, we disagree.

The admission or exclusion of lay-opinion evidence is "committed to the sound discretion of the trial court, and we will not interfere with such a ruling absent an abuse of that discretion."[32] In relevant part, OCGA § 24-7-701 provides:

> (a) If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences shall be limited to those opinions or inferences which are: (1) Rationally based on the perception of the witness; (2) Helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and (3) Not based on scientific, technical, or other specialized knowledge within the scope of Code Section 24-7-702.[33]

Here, Cawthon objected to the following testimony, which he quotes in his brief:

---

[32] *Faulkner v. State*, 295 Ga. 321, 324 (2) (758 SE2d 817) (2014).

[33] Because Cawthon's trial was held in 2017, our new Evidence Code applies. *See* Ga. L. 2011, pp. 99, 214, § 101 (providing that Georgia's "new" Evidence Code applies "to any motion made or hearing or trial commenced on or after" January 1, 2013). And we note that OCGA § 24-7-701 (a) "is modeled on Federal Rule of Evidence 701 (a), and when we consider the meaning of such provisions, we look to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Eleventh Circuit." *Glenn v. State*, 302 Ga. 276, 280 (II) (806 SE2d 564) (2017).

16

Prosecutor: Would you think that someone that was avoiding [H. R.] and running from her like that and hiding from her . . . .

S. W.: Would say stuff like that?

Prosecutor: Would be wanting to have sex with her?

S. W.: No.

Defense Counsel: Same objection.[34]

Trial Court: Same ruling. You can answer that question.

S. W.: No.

Prosecutor: You would not think that he would, right?

S. W.: No.

Prosecutor: Those two don't match up, do they?

S. W.: No.

Cawthon then contends S. W. expressed her opinion that "[he] would hide from [H. R.] [and] claimed that he was not home to avoid her," and that the Facebook messages

_____

[34] Immediately prior to defense counsel's objection to the challenged testimony, he objected to other testimony because it "call[ed] for speculation." In response, the State asserted that S. W. described certain behavior that Cawthon engaged in around H. R., and she should be able to testify as to whether the behavior she observed was consistent with the documentary evidence, showing that he repeatedly asked H. R. to have sex with him in online messages. The court overruled Cawthon's objection.

showed he was asking H. R. for sex. He then summarily concludes that it was the exclusive province of the jury "to draw any opinion from those to facts . . . ." But merely reciting evidence followed by a conclusory sentence alleging error is insufficient to raise an issue on appeal.[35] Indeed, Cawthon does not reference OCGA § 24-7-701 (a), which governed the admissibility of lay-witness opinion testimony at the time of his 2017 trial, nor does he explain why the complained-of testimony must be excluded under that statute. Instead, Cawthon relies on a single case, which describes the standard for the admissibility of lay-witness opinion testimony that applied in 2003,[36] well before the enactment of our "new" Evidence Code. But

[35] *See Atkinson v. State*, 243 Ga. App. 570, 574 (2) (531 SE2d 743) (2000) (deeming an argument abandoned when the appellant cited to the general legal standard and presented a single sentence making a conclusory allegation that evidence was insufficient to support his conviction); *Green v. State*, 208 Ga. App. 1, 2-3 (2) (429 SE2d 694) (1993) ("The principal purpose of argument is to provide guidance to this [C]ourt on the basis for a claim of error and for citations of authority which tend to support appellant's allegation of error. A mere recital, or repetition, of the enumerated error is not argument. Further, argument merely rephrasing the enumerated errors is insufficient because enumerations are conclusory and insufficient to raise justiciable issues." (punctuation and citation omitted)).

[36] *See Hines v. State*, 276 Ga. 491, 494 (578 SE2d 868) (2003) ("Lay witnesses may state their opinion only when it is based upon their own observations, and their opinions are admissible only when it is necessary in order for a witness to convey those same observations to the jury. A lay witness may not state his opinion when the facts relied upon by the witness can be clearly described for the jury, and the jury can rely upon those same facts and reach its own opinion. Otherwise, by stating an

18

regardless of whether the 2003 case is still good law, Cawthon provides no meaningful argument that the relevant testimony was inadmissible. Thus, because this enumeration of error is "essentially unsupported, we deem it abandoned[.]"[37]

3. Finally, Cawthon argues that the trial court erred in denying his motion for a mistrial after H. R. identified him at trial by pointing toward him and stating that he was in "prison clothes." This claim likewise lacks merit.

We review the trial court's denial of Cawthon's motion for a mistrial for an abuse of discretion.[38] And Cawthon is indeed correct that, at trial, when H. R. was asked to identify her attacker and to describe what he was wearing, she gestured toward him and stated that he was wearing "prison clothes." Cawthon's counsel immediately objected, and outside the presence of the jury, he moved for a mistrial, arguing that H. R.'s incorrect statement that he was wearing prison clothes was "completely prejudicial." The State responded by pointing out that the jury could see

---

opinion the jury could reach for itself, the lay witness is deemed to have invaded the jury's exclusive province." (punctuation and footnotes omitted)).

[37] *Higgins v. State*, 251 Ga. App. 175, 178 (3) (554 SE2d 212) (2001); *see Flowers v. State*, 269 Ga. App. 443, 445 (1) (604 SE2d 285) (2004) ("[L]egal analysis is, at a minimum, a discussion of the appropriate law as applied to the relevant facts." (punctuation omitted)).

[38] *See, e.g.*, *State v. Crews*, 343 Ga. App. 289, 294 (3) (807 SE2d 92) (2017).

for themselves that Cawthon was wearing a collared polo shirt. Defense counsel again requested a mistrial, noting that Cawthon was wearing a red golf shirt. But the State countered by noting that the witness had a limited mental capacity, and the mistake could be cleared up through a few more questions or by a limiting instruction. The trial court agreed, finding that it could be established through direct testimony or cross-examination that H. R. was mistaken about Cawthon's clothes, and therefore denied the motion for a mistrial. Immediately thereafter, H. R. was asked again about Cawthon's attire, and she testified that he was wearing a white undershirt, a collared shirt, and black pants.

On appeal, Cawthon maintains that H. R. incorrectly testifying that he was wearing prison clothes and the trial court "agreeing" with her was unduly prejudicial and justified the grant of a mistrial. But it is clear from the record that Cawthon was *not* wearing prison clothes, which the jury could see for themselves, and regardless, when asked a few follow-up questions about Cawthon's clothing, H. R., who, as the jury was aware, has significant mental impairments, corrected her testimony regarding his attire. And as to the trial court "agreeing" with H. R., the court initially stated *outside the presence of the jury* that H. R. "correctly identified [Cawthon's clothes] as prison clothes." But it is clear from the entire discussion regarding the motion for

20

a mistrial between the court and the parties, as well as from the court's ruling itself, that the court understood Cawthon was not wearing a prison uniform. In any event, the jury did not hear the court's incorrect comment, and not only did additional testimony establish that Cawthon was not wearing prison clothes, the jury could see what he was wearing for themselves. Under such circumstances, Cawthon cannot establish that he was harmed or prejudiced by H. R.'s initial incorrect testimony about his clothes.[39]

For all these reasons, we affirm Cawthon's conviction.

*Judgment affirmed. Gobeil and Hodges, JJ., concur.*

---

[39] *See Hampton v. State*, 338 Ga. App. 864, 874 (2) (792 SE2d 124) (2016) ("[A defendant] must show harm as well as error to obtain a new trial."); *Gresham v. State,* 281 Ga. App. 116, 119 (635 SE2d 316) (2006) ("[I]n order for an error to be grounds for reversal, the appellant must show not only error but ensuing harm." (punctuation omitted)).