**THIRD DIVISION
MCFADDEN, C. J.,
DOYLE, P. J., and HODGES, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**October 26, 2020**

# In the Court of Appeals of Georgia

A20A1028. PRESCOTT v. THE STATE.

HODGES, Judge.

Following a jury trial, the Superior Court of Fulton County entered a judgment of conviction against Shavon Jabbar Prescott for two counts of aggravated sodomy (OCGA § 16-6-2), three counts of aggravated assault (family violence) (OCGA § 16-5-21) (2013), two counts of battery (family violence) (OCGA § 16-5-23.1) (2013),[1] and one count each of trafficking of persons for labor or sexual servitude (OCGA § 16-5-46) (2013), pimping (OCGA § 16-6-11), pandering (OCGA § 16-6-12), false imprisonment (OCGA § 16-5-41), aggravated assault with a deadly weapon (OCGA § 16-5-21) (2013), and giving false information to a law enforcement officer (OCGA § 16-10-25). Prescott appeals pro se from the trial court's denial of his motion for

---

[1] The jury acquitted Prescott of an additional count of battery (family violence).

new trial as amended, raising 30 enumerations of error. For the reasons that follow, we affirm.

Viewed in a light most favorable to the jury's verdict,[2] the evidence revealed that the victim met a man named "Jehovah Israel," later identified as Prescott, at a bar in January 2013. The two exchanged telephone numbers, texted, and eventually started dating. During their first date, Prescott stated that he went by the nickname "Hova," which was short for "Jehovah." On their third date in February 2013, the victim shared, during dinner, that she needed to find another job in order to find a place to live on her own. To this point, the victim did not suspect anything was wrong with Prescott or feel concern that he was a violent person. As they drove off after dinner, Prescott asked the victim if she was still interested in finding a job and stated that he had a job for her: "It may not be what you want, but at least you'll be making money." The victim thought Prescott was referring to selling drugs and declined, and the two "laughed it off. . . ." However, Prescott then said, "[w]ell, you may not want to do it, but you're going to ho for me." Prescott then produced a small handgun and pointed it at the victim's head.

---

[2] See, e.g., *Ellis v. State*, 316 Ga. App. 352, 354 (1) (729 SE2d 492) (2012).

2

At some point during their drive, Prescott took the victim's mobile telephone. The victim began screaming, and Prescott kept saying, "[b]itch, shut up." Prescott drove to a house on Toccoa Circle in Union City, Fulton County, pulled into the garage, and pulled the victim into the house by her arm. Once inside, Prescott began punching the victim, and he then pulled her upstairs and forced her to perform fellatio on him. Prescott then made her sit in front of him as he yelled at her that she would be engaging in sex acts with other men. He instructed her to go downstairs, open the front door, take cash from the customer (whom Prescott referred to as "[t]ricks or plays"), bring the money to him, and then go back downstairs to perform sex acts with the customer. During such acts, Prescott would position himself from an upstairs vantage point that allowed him to see the victim and the customer; he told the victim that if she attempted to signal the customer or ask for help, he would kill her and the customer.

The victim's first experience with a "trick" came later that evening. Prescott gave the victim liquor in an attempt to calm her nerves. Apparently noticing the victim was nervous, the customer asked the victim if she was okay, and she responded that she was, fearful that Prescott would kill her. The victim then had sex with the customer, followed by other customers that same evening and every day for the next

3

several days. Through threats to kill her and her family, Prescott detained the victim at the residence for the next several weeks. Prescott purchased clothes for the victim to wear, requiring that she wear only a bra, shorts, and heels or boots. He also instructed her to wear a wig in order to "look the part" and to prevent her identification with her real hair. When he ultimately began allowing the victim to answer her telephone to speak with potential "tricks," Prescott ordered her what to say and struck her when she spoke "too proper," telling her to "talk slang."

Based upon Prescott's initial instructions to her, the victim felt that he had engaged in this conduct before. The State introduced advertisements by "Hova" imploring the recipient to "[c]ome get with a young hustler who is about that life. I will provide a place, fly whip to ride in, and what ever you need." The victim identified the person in the advertisements as Prescott. The victim also learned that she had been advertised on backpage.com, "a site where men or even women could go to try to find someone to have sex with[,]" using photographs taken from the telephone Prescott confiscated from the victim. In addition, the victim discovered that Prescott was using the false name of "Tamar Byirt," taken from a stolen driver's license.

During the time that the victim served Prescott, he punched her, kicked her, spat upon her, and, on one occasion, pistol-whipped her. In another encounter, after the victim remarked that a singer on television looked handsome, Prescott ordered her into the bathroom, told her not to "ever make a comment about another dude," and burned her arm with an iron. Because she was scared of Prescott, the victim began telling him that she loved him and would "try to do any and everything he asked [her] to do right." Prescott also took the victim to South Carolina and offered her for sex acts from a hotel room.

In April 2013, Prescott and the victim gathered her possessions and she moved in with him. Eventually, Prescott allowed the victim to speak with her mother and sister — as he sat next to her holding a handgun. The victim pretended that everything was okay. Prescott also allowed the victim to meet her mother and sister for a meal in May 2013, and the victim again pretended that nothing was wrong. Although both her mother and sister noticed the burn injury on her arm, the victim claimed that she had simply dropped a hot curling iron on her arm. Prescott threatened to kill the victim and her family if she ever sought help from them.

Meanwhile, Prescott continued to abuse the victim in other ways. In addition to forcing the victim to perform sex acts with visitors, Prescott also forced her to

perform anal intercourse and fellatio with him. Prescott also required the victim to continue meeting visitors while on her menstrual cycle. The victim slept in the same room with Prescott, and if she moved, he moved.

The victim later met Lauren Blair, whom the victim knew as "Renee," when Blair occasionally visited Prescott at his house for sex. When the victim first met Blair, she cried out to Blair and begged to leave with her. Instead of helping the victim, Blair told Prescott what she said. Prescott then charged the victim, grabbed her shirt, and said she "wasn't going nowhere" and that she was "his."[3]

Prescott also used the victim to recruit other women in clubs for prostitution and once used the victim to approach a woman named "Fancy" whom Prescott and the victim saw walking down the street one day. A couple of days later, Prescott and the victim picked up Fancy and brought her to the house on Toccoa Circle. Although the victim did not hear Prescott giving Fancy any instructions, he forced Fancy and the victim to perform sex acts on each other, on himself, and with visitors. The victim

[3] At trial, Blair, whose middle name is Renee, denied that the victim had ever asked her for assistance. In addition, evidence revealed that Blair spoke to Prescott while he was in jail following his arrest and that she may have assisted Prescott in destroying evidence.

also instructed Fancy on how she was to act with the customers. Prescott also physically abused the victim in front of Fancy.

Prescott's racket began to unravel when a police officer showed up at his door one day. Shortly after a customer arrived for sex, the officer knocked on the door; the victim answered the door, and the officer asked if someone named "Dominique" lived there. Not knowing Fancy's real name, the victim replied "no," but said a woman named "Fancy" lived there. A woman standing with the officer exclaimed, "that's my daughter," and the officer asked the victim to bring Fancy to the door. The victim complied, but did not then call out for help herself; instead, she lied to the officer because she thought she was "in big trouble." During this encounter, Prescott was hiding inside the house. The customer exited the house with the victim, and the officer found Prescott during a search of the house; Prescott gave his name as "Tamar Byirt." The officer briefly detained the three, took their identification cards, and released Prescott and the customer. The officer placed Dominique in custody following an altercation and left the scene.

In June 2013, Prescott confronted the victim about money he thought was missing from prepaid cards he used to place advertisements on backpage.com. When she said she didn't have any money, Prescott said, "You have one minute to find my

money or it's going to get real ugly." When the victim again protested, he pistol-whipped her on the head so violently that she urinated and defecated on herself and bled from her eye. He also began choking her. She then claimed to know where some money was hidden downstairs; however, that was a ploy to attempt escape. Prescott grabbed her, slammed her to the floor, and began kicking, punching, and spitting on her. He then took her to an upstairs bathroom, forced her into the shower, closed the curtain, pulled out a handgun, and said, "I'm going to kill you. You better tell me what you're doing with my money." The victim lied and said she gave money to her mother. Prescott then told the victim he forgave her, said, "[w]hat are we going to do about your family[,]" and forced the victim to perform fellatio on him and kiss his feet. She later used a towel to wipe the blood from her eye.

Prescott's final degradation occurred on June 18, 2013. Prescott was again unable to use a prepaid card to purchase an advertisement on backpage.com, so he threw the victim on the bed, began choking her, and said, "[b]itch, when I get out of this shower, you better make that card go through or I'm going to kill you." She asked to use the bathroom in another part of the house; Prescott agreed, and when she left the bedroom, she ran from the house. She fled to a neighbor's house and burst through the door, screaming for help, and the neighbor called police. When officers

arrived, they met with the victim, who directed them to Prescott's residence. As an officer approached the house, the garage door lifted and Prescott attempted to back out of the garage. The officer then detained Prescott, who identified himself as "Tamar Byirt." Officers found two identification cards on Prescott's person during a pat-down search — one for Tamar Byirt and one for Prescott. During a subsequent search of the residence, officers located wigs, women's shoes, a corset, and a towel. An expert in human trafficking testified that the victim's description of her activities and abuse was consistent with being ensnared in sexual servitude. Testing of the towel taken from Prescott's residence revealed the presence of the victim's blood.

A Fulton County grand jury indicted Prescott for two counts of aggravated sodomy, three counts of aggravated assault (family violence), three counts of battery (family violence), and one count each of trafficking of persons for labor or sexual servitude, pimping, pandering, false imprisonment, aggravated assault with a deadly weapon, and giving false information to a law enforcement officer. Prior to his trial, Prescott filed a number of pro se motions despite the fact that he was represented by counsel. With the exception of one count of battery (family violence), the jury returned guilty verdicts against Prescott on each count of the indictment. After trial, Prescott insisted that he represent himself. Following a hearing pursuant to *Faretta*

9

*v. California*, 422 U. S. 806 (95 SCt 2525, 45 LE2d 562) (1975), the trial court allowed Prescott to proceed pro se, and he filed a motion for new trial with several amendments. The trial court denied Prescott's motion as amended, and he appeals pro se.

1. At the outset, Prescott's opening brief suffers from numerous egregious violations of this Court's rules. Most glaringly, *none* of Prescott's 30 enumerations of error are supported by any argument or citation of authority. See Court of Appeals Rule 25 (c) (2) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned."). Indeed, Prescott's enumerations, which span 18 handwritten pages, are followed by a "Citation of Authority" of one-half page, which merely contains a string citation of assorted constitutional provisions and random sections of the Official Code of Georgia, *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963), and *Sampson v. State*, 124 Ga. 776 (53 SE 332) (1906). Equally as distressing, the appellant's brief does not contain a single "citation of the parts of the record or transcript essential to a consideration of the errors[.]" Court of Appeals Rule 25 (a) (1); see also Court of Appeals Rule 25 (c) (2) (i) ("*Each* enumerated error shall be supported in the brief by specific reference to the record or transcript.") (emphasis supplied); *Cawthon v. State*,

10

350 Ga. App. 741, 744 (1) (a) (830 SE2d 270) (2019) (noting that "this Court will not typically address arguments in the complete absence of record and transcript citations"). These deficiencies are particularly troublesome in an appellate record that spans more than 2,000 pages, because "it is not the function of this Court to cull the record on behalf of a party in search of instances of error." (Citation and punctuation omitted.) Id. at 743.

Moreover, the brief does not contain "the method by which each enumeration of error was preserved for consideration" on appeal. Court of Appeals Rule 25 (a) (1). Furthermore, Prescott's minimalist "Citation of Authority" does not correspond with the stated enumeration of errors. See Court of Appeals Rule 25 (c) (1) ("The sequence of arguments in the briefs shall follow the order of the enumeration of errors, and shall be numbered accordingly."); *Crawford v. State*, 314 Ga. App. 796 (726 SE2d 58) (2012) (appellant raised 14 enumerations of error but only five non-corresponding argument sections).

In short, our rules do not exist in a vacuum; rather, they are based, at least in part, on the well-recognized and "sound rule of appellate practice that the burden is always on the appellant in asserting error to show it affirmatively by the record."

11

(Citation and punctuation omitted.) *Mathis v. State*, 299 Ga. App. 831, 835 (1) (b), n. 15 (684 SE2d 6) (2009). To that end,

> the rules of this court are not intended to provide an obstacle for the unwary or the pro se appellant. Briefs that do not conform to the rules regarding enumerations of error, structure of briefs, argument, or citation of authorities, as [Prescott] fails to do, are not merely an inconvenience or grounds for refusing to consider a party's contentions. Such briefs hinder this court in determining the substance and basis of an appellant's contentions both in fact and in law and may well prejudice an appellant's appeal regardless of the amount of leniency shown. Nevertheless, we will address [Prescott's] arguments, insofar as we are able to ascertain them from his brief.

(Citation omitted.) *Anderson v. State*, 335 Ga. App. 78, 80 (2) (778 SE2d 826) (2015); see also *Zywiciel v. Historic Westside Village Partners*, 313 Ga. App. 397, 401, n. 18 (721 SE2d 617) (2011) ("[Prescott] has hampered our ability to ensure that all his arguments not addressed by enumerations of error are addressed. Accordingly, he is wholly responsible for any allegation of error that we are unable to fully address.") (citation and punctuation omitted); *Fleming v. Advanced Stores Co.*, 301 Ga. App. 734, 735 (688 SE2d 414) (2009) ("We recognize that [Prescott] is acting pro se; nevertheless, 'that status does not relieve him of the obligation to comply with the substantive and procedural requirements of the law, including the rules of this

12

Court.'") (citation and punctuation omitted). Accordingly, we have combined

Prescott's enumerations where possible in an effort to address, as best we can, the

arguments we are able to discern and properly consider under our rules. See

*Sevostiyanova v. State*, 313 Ga. App. 729, 730 (722 SE2d 333) (2012).

2. In three interrelated enumerations, Prescott contends that the evidence was

insufficient to support his convictions.[4] We disagree.

> On appeal from a criminal conviction, the evidence must be viewed in
> the light most favorable to the verdict, and the appellant no longer
> enjoys the presumption of innocence; moreover, an appellate court does
> not weigh the evidence or determine witness credibility but only
> determines whether the evidence is sufficient under the standard of
> *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).
> As long as there is some competent evidence, even though contradicted,

---

[4] Two of Prescott's enumerations invoke the general grounds. See OCGA §§ 5-5-20, 5-5-21.

> Trial courts have discretion to grant a new trial on these grounds . . . but
> appellate courts do not. Our review is limited to the legal sufficiency of
> the evidence. Indeed, even when asked to review a trial court's refusal
> to grant a new trial on the general grounds, this Court must review the
> case under the standard set forth in *Jackson v. Virginia*.

(Citations and punctuation omitted.) *Lewis v. State*, 351 Ga. App. 603, 604 (2) (831 SE2d 837) (2019).

13

to support each fact necessary to make out the State's case, the jury's verdict will be upheld.

(Citation and punctuation omitted.) *Watkins v. State*, 336 Ga. App. 145, 146 (1) (784 SE2d 11) (2016); see also *Conley v. State*, 329 Ga. App. 96 (763 SE2d 881) (2014). It is well-settled that "the testimony of a single witness is generally sufficient to establish a fact." (Citation and punctuation omitted.) *Cross v. State*, 354 Ga. App. 355, 358 (1) (839 SE2d 265) (2020); see also OCGA § 24-14-8.

(a) *Aggravated sodomy*. "A person commits the offense of aggravated sodomy when he or she commits sodomy with force and against the will of the other person. . . ." OCGA § 16-6-2 (a) (2). Sodomy occurs when a person "performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another." OCGA § 16-6-2 (a) (1). The State indicted Prescott for two counts of aggravated sodomy for forcibly performing anal intercourse and fellatio on the victim. The victim unequivocally testified that Prescott forced her to perform anal intercourse and fellatio with him against her will. Thus, we conclude that the evidence was sufficient to convict Prescott of aggravated sodomy. See, e.g., *Cross*, 354 Ga. App. at 357-358 (1).

(b) *Aggravated assault (family violence)*. "A person commits the offense of aggravated assault when he or she assaults . . . [w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury[.]" OCGA § 16-5-21 (a) (2); see also OCGA § 16-5-21 (j) (2013). Prescott's charges against the victim, who lived with him, included striking the victim with a handgun, striking her with his fists, and strangling her. The victim testified that, beginning with her arrival at Prescott's house and continuing after she moved in with him, Prescott punched her on several occasions. In addition, evidence revealed that Prescott choked and pistol-whipped the victim when he thought that she had taken money from him. Therefore, the evidence was sufficient to convict Prescott of aggravated assault (family violence). See, e.g., *Moore v. State*, Case No. A20A1348, 2020 Ga. App. LEXIS 518, at *4 - *5 (1) (a) (Ga. App. Sept. 21, 2020); *Jones v. State*, 294 Ga. App. 564, 566 (1) (669 SE2d 505) (2008).

(c) *Battery (family violence)*. "A person commits the offense of battery when he or she intentionally causes substantial physical harm or visible bodily harm to another." OCGA § 16-5-23.1 (a); see also OCGA § 16-5-23.1 (f) (2013). The State accused Prescott of causing visible bodily harm to the victim by punching and

15

strangling her. In addition to the testimony cited above concerning Prescott's acts of choking and punching the victim, photographs of her injuries were admitted at trial. Moreover, the victim's mother noted that the victim had bruising around her neck and a scar on her face when she picked up the victim following her escape. Similarly, the officer who responded to the neighbor's house after the victim fled noticed bruising on the victim's neck. The evidence was, again, sufficient to convict Prescott of battery (family violence). See, e.g., *Moore*, 2020 Ga. App. LEXIS 518, at *5 - *6 (1) (b); *Walker v. State*, 315 Ga. App. 821, 823 (728 SE2d 334) (2012).

(d) *Trafficking of persons for labor or sexual servitude*. "A person commits the offense of trafficking a person for sexual servitude when that person knowingly subjects another person to or maintains another person in sexual servitude. . . ." OCGA § 16-5-46 (c) (1) (2013). "'Sexual servitude' means . . . any sexually explicit conduct or performance involving sexually explicit conduct for which anything of value is directly or indirectly given . . . or received by any person, which conduct is induced or obtained by coercion or deception. . . ." OCGA § 16-5-46 (a) (6) (A) (2013). The State indicted Prescott for coercing the victim to engage in sexual activities with other partners and for threatening her family if she attempted to leave him. Evidence revealed that, after Prescott and the victim dated for a short time,

16

Prescott told the victim when she was in his vehicle, "you may not want to do it, but you're going to ho for me." He then pointed a handgun at her head and drove her to his residence, where he punched her and forced her to perform fellatio on him. Thereafter, he instructed the victim on how to prostitute herself, including delivering money from customers to him, and threatened to kill her and her family if she ever signaled a customer for assistance.

Over the course of the next four months, Prescott advertised the victim for sexual services for which he received money; purchased clothing for her and instructed her on how to dress for customers; required her to perform sex acts with customers and with himself; repeatedly threatened to kill her and her family; and even drove her to South Carolina, where he again offered her for sex acts with customers. Moreover, an expert in human trafficking testified that the victim's description of her experience was consistent with trafficking and sexual servitude. We conclude that this evidence is sufficient for any rational trier of fact to find Prescott guilty beyond a reasonable doubt of the crime of trafficking of persons for sexual servitude. See *Grace v. State*, 347 Ga. App. 396, 398-399 (1) (819 SE2d 674) (2018).

(e) *Pimping*. Relevant to this case, pimping occurs when a person "[a]ids or abets, counsels, or commands another in the commission of prostitution. . . ." OCGA

17

§ 16-6-11 (5); see also OCGA § 16-6-9 (2013) ("A person commits the offense of prostitution when he or she performs or offers or consents to perform a sexual act, including, but not limited to, sexual intercourse or sodomy, for money or other items of value."). Prescott was charged with aiding and abetting the victim in the commission of prostitution. In view of the evidence recounted above, including Prescott's advertisements for the victim's sexual services, providing her with clothing and a location for those services, and using the victim's telephone to arrange customers for those services, we conclude that the evidence was sufficient to find Prescott guilty beyond a reasonable doubt of pimping by aiding and abetting the victim in committing prostitution. See *Creighton v. State*, 327 Ga. App. 825, 828 (1) (b) (761 SE2d 373) (2014).

(f) *Pandering*. "A person commits the offense of pandering when he or she solicits a person to perform an act of prostitution in his or her own behalf. . . ." OCGA § 16-6-12. Here, the victim testified that Prescott told her that she would prostitute herself for him, transported her to his residence, physically assaulted and threatened her repeatedly, and forced her to perform sex acts with customers for money, which she gave to him. This evidence is sufficient to convict Prescott of

pandering. See *Kea v. State*, 344 Ga. App. 251, 254 (2) (a) (810 SE2d 152) (2018); see also OCGA § 16-6-9 (2013).

(g) *False imprisonment.* "A person commits the offense of false imprisonment when, in violation of the personal liberty of another, he . . . detains such person without legal authority." OCGA § 16-5-41 (a). The victim testified that Prescott detained her at his residence over the course of four months through a pattern of abuse and threats, including multiple threats to kill her, her family, and her customers should she attempt to leave. We conclude that this evidence was sufficient to allow a rational trier of fact to find Prescott guilty beyond a reasonable doubt of false imprisonment. See *Taylor v. State*, 344 Ga. App. 122, 130-131 (1) (f) (809 SE2d 76) (2017); *Schneider v. State*, 312 Ga. App. 504, 508 (3) (718 SE2d 833) (2011).

(h) *Aggravated assault with a deadly weapon.* Aggravated assault also occurs when a person assaults another with a deadly weapon. OCGA § 16-5-21 (a) (2) (2013). The State charged Prescott with pointing a handgun at the victim. The victim testified that Prescott first pointed a handgun at her when they were traveling to his residence from their third date. Thereafter, the victim described other occasions when Prescott pointed a handgun at her, including when Prescott forced her into a shower, closed the curtain, pointed the handgun at her, and threatened to kill her. This

19

evidence is sufficient to support Prescott's conviction for aggravated assault. See, e.g., *Taylor*, 344 Ga. App. at 130 (1) (e).

(i) *Giving false information to a law enforcement officer*. "A person who gives a false name, address, or date of birth to a law enforcement officer in the lawful discharge of his official duties with the intent of misleading the officer as to his identity or birthdate is guilty of a misdemeanor." OCGA § 16-10-25. Prescott was accused of giving an officer a false name and date of birth. The evidence revealed that, when he was apprehended following the victim's escape, Prescott gave officers the name "Tamar Byirt." Officers searched Prescott's pockets when he was apprehended, and found identification cards for Byirt and Prescott. Moreover, Prescott's criminal case identified him as Shavon Jabbar Prescott. Therefore, "[t]he evidence was sufficient for a rational trier of fact to find that appellant's real name was [Shavon Jabbar Prescott] and that he gave a false name to the [responding officer]." *Singleton v. State*, 259 Ga. App. 184, 186 (3) (577 SE2d 6) (2003).

In sum, we conclude that the evidence was sufficient to find Prescott guilty beyond a reasonable doubt of each of the crimes for which he was convicted.

3. Prescott also raises several claims of ineffective assistance of trial counsel, including trial counsel's alleged failure to: (1) appeal certain unidentified trial court

rulings; (2) adequately investigate his arrest; (3) advise him of his appellate rights; (4) cross-examine "important," yet unidentified, witnesses; and (5) file a motion to suppress unidentified evidence. None are meritorious.

To demonstrate ineffective assistance of trial counsel, Prescott "has the burden of proving that counsel's performance was deficient, and that, but for the deficiency, there was a reasonable probability the outcome of the trial would have been different." (Citations and punctuation omitted). *State v. Banks*, 337 Ga. App. 749, 751 (789 SE2d 619) (2016). "This burden, although not impossible to carry, is a heavy one, because when reviewing ineffective assistance of counsel claims, this Court applies a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance." (Citations and punctuation omitted.) *Wiggins v. State*, 338 Ga. App. 273, 283 (6) (787 SE2d 357) (2016). If a defendant fails to satisfy either prong of the test for ineffective assistance of counsel, it is not incumbent upon this Court to examine the other prong. See, e.g., *Thomas v. State*, 318 Ga. App. 849, 857 (5) (734 SE2d 823) (2012).

Of the five specific grounds of ineffective assistance of counsel Prescott raised, he did not question trial counsel about any of them.[5] Nor did Prescott testify during the hearing on his motion for new trial. Accordingly, even assuming that Prescott's allegations of ineffective assistance are definite enough to permit review, see *Pinson v. State*, 266 Ga. App. 254, 259 (3) (b) (596 SE2d 734) (2004), he has failed to present any evidence or point to evidence in the record in support of his allegations. It necessarily follows that Prescott has not satisfied the heavy burden to demonstrate ineffective assistance of trial counsel. See *Wiggins*, 338 Ga. App. at 283 (6).

4. In two enumerations, Prescott contends that the trial court violated his right to a speedy trial under the United States and Georgia constitutions because it failed to try him within a reasonable time. In view of Prescott's failure to support the enumerations with citations of authority or to the record, however, these enumerations are deemed abandoned. See Court of Appeals Rule 25 (c) (2); *Smith v. State*, 277 Ga. App. 321, 322 (626 SE2d 540) (2006) (finding that defendant waived speedy trial arguments for appellate review due to lack of argument).

---

[5] Prescott briefly questioned one of his trial counsel about the failure to challenge certain evidence because the evidence "wasn't part of the discovery." However, since the question did not raise any legal basis to suppress the evidence, Prescott has again failed to demonstrate error by trial counsel.

5. Prescott further contends that he was denied his right to trial by jury because the trial court, rather than the jury, sentenced him. Inasmuch as Prescott was not facing a charge punishable by death, he did not have a right to a sentencing hearing before a jury. See OCGA § 17-10-2 (a) (1) ("Except in cases in which the death penalty may be imposed, upon the return of a verdict of 'guilty' by the jury in any felony case, *the judge shall dismiss the jury* and shall conduct a presentence hearing at which the only issue shall be the determination of punishment to be imposed.") (emphasis supplied). Thus, there is no error.

6. Prescott asserts, with no citations to the record or to supportive authority, that the "verdict, sentence, and judgment violates the constitution or laws of the United States." "This enumeration is too vague and indefinite and presents nothing for review." (Citation and punctuation omitted.) *Pinson*, 266 Ga. App. at 259 (3) (b); see also *Martin v. State*, 223 Ga. 649, 653 (7) (157 SE2d 458) (1967).

7. Next, Prescott argues that the trial court erred by allowing the State "to make statements of prejudicial matters which were not in evidence and which were also [contradictory]," and by not declaring a mistrial. Not only has Prescott failed to identify the "statements of prejudicial matters" he contests, he has not shown where

23

in the record he objected to the phantom statements or moved for a mistrial.[6] And even if Prescott did *not* move for a mistrial, "the trial court was required to act sua sponte only if there was a manifest necessity for a mistrial." (Citation and punctuation omitted.) *Burden v. State*, 296 Ga. App. 441, 446 (4) (a) (674 SE2d 668) (2009). Prescott has not identified any such necessity. See, e.g., *Davenport v. State*, 316 Ga. App. 234, 238 (2) (729 SE2d 442) (2012). As a result, this enumeration fails.

8. Prescott also contends that "the verdict was decided upon material evidence illegally admitted and evidence illegally withheld from the jury." For the reasons and authority cited in Division 6, supra, this enumeration is without merit. See *Martin*, 223 Ga. at 653 (7); *Pinson*, 266 Ga. App. at 259 (3) (b).

9. Under the broad category of "equal protection and due process," Prescott asserts that his rights were violated because: (1) the trial court, his trial counsel, and the State submitted false and perjured documents and evidence through his trial counsel; (2) the State presented false statements and narratives of the crimes to the jury; (3) "the trial court and the State intentionally denied [him] procedural due

---

[6] A brief review of the trial transcript reveals two occasions where Prescott's counsel moved for a mistrial. Prescott's enumeration does not identify which of the trial court's rulings on these two motions he challenges, or if there are other instances for which a mistrial should have been granted.

process;" (4) the State shifted the burden of proof "in the presence and hearing of the jury[;]" (5) he "was denied the fundamental federal and State constitutional rights, privileges, and immunities guaranteed him by, both the Georgia and the United States constitutions;" and (6) the trial court denied his motion to strike and disqualify the entire jury panel due to an unidentified comment by a prospective juror. Notwithstanding the vague and indefinite nature of Prescott's enumerations, see *Martin*, 223 Ga. at 653 (7); *Pinson*, 266 Ga. App. at 259 (3) (b), none are supported by citations of authority or to the record. As a result, these enumerations are deemed abandoned. Court of Appeals Rule 25 (c) (2).

10. Prescott next argues, in a series of enumerations, that he was deprived of a fair trial due to the State's submission of a variety of false documents, including: (1) "perjured and tampered testimonies, phone recordings, documents, depositions, evidence, indictment, and court records which had been purposefully altered;" (2) a statement by a law enforcement officer before the grand jury that contradicted Prescott's indictment; (3) a "falsified . . . indictment;" and (4) "falsified court records, calendars, and documents which resulted in an unlawful indictment. . . ." Not only has Prescott failed to cite to the documents in the record, much less even specifically identify the allegedly offending documents, the enumerations are vague and indefinite

25

and are not supported by citations of authority. Therefore, they are deemed abandoned. Court of Appeals Rule 25 (c) (2).

11. Prescott also contends that his conviction was procured by the State's pervasive misconduct, including: (1) "tampering and altering evidence and documents . . . and by intentionally and deliberately manipulating the court proceedings with false statements and lies in the hearing of the jury[;]" (2) "illegal wiretapping[,] perjured affidavits[;] perjured and tainted jail phone recordings[;] illegally admitted perjured testimonies[;] [and] altered and amended pretrial and trial transcripts[;]" and (3) false statements concerning the tenure of a law enforcement officer. For the reasons stated in Divisions 9 and 10, supra, these enumerations are deemed abandoned. Court of Appeals Rule 25 (c) (2).

12. Prescott argues that the State, "in joint conspiracy with both the Public Defenders Office and the Metro Conflict Defenders Office . . . withheld favorable evidence towards [Prescott] from the jury during deliberations" and "illegally issued subpoenas to persons not listed in the . . . indictment. . . ." By failing to identify the subject evidence, the manner in which the subpoenas were issued, and the persons upon whom the subpoenas were served, Prescott's enumeration presents nothing for our review. See *Martin*, 223 Ga. at 653 (7); *Pinson*, 266 Ga. App. at 259 (3) (b).

26

13. Prescott next asserts that the trial court abused its discretion in failing to hear his complaints about his appointed trial counsel, resulting in a conflict of interest. Absent citations to the record, argument in support of the enumeration, and authority in support of the argument, this enumeration is deemed abandoned. See Court of Appeals Rule 25 (c) (2).

14. Finally, Prescott argues that the trial court "did not set reasonable and consistent bail" or grant him an appeal bond. To the extent Prescott challenges the trial court's alleged failure to award him a reasonable bond prior to trial, the same is deemed abandoned. See Court of Appeals Rule 25 (c) (2). Furthermore, any argument concerning an appeal bond is moot in view of our affirmance of Prescott's convictions. See, e.g., *Lawson v. State*, 242 Ga. 744, 745 (2) (251 SE2d 304) (1978).

In sum, we conclude that the evidence was sufficient to find Prescott guilty beyond a reasonable doubt of the crimes for which he was convicted. We also conclude that Prescott failed to satisfy his burden to demonstrate ineffective assistance of trial counsel. Finally, we conclude that Prescott's remaining arguments are either without merit or deemed abandoned. Therefore, we affirm the trial court's denial of Prescott's motion for new trial.

*Judgment affirmed. McFadden, C. J., and Doyle, P. J., concur*.

27